THE CHEBOYGAN LUMBER COMPANY v. THE DELTA
TRANSPORTATION COMPANY.

*Negligence—Setting fires by steamboats—Insufficient appliances—
Interstate commerce—Construction of federal statutes.*

1. The owner of a steamboat is not under the legal duty to use
the most effective means known to prevent the escape of
sparks from its smokestack, and, if he uses an appliance or
device which experience has shown to be reasonably effective
in accomplishing that result, he is not required to use addi-
tional appliances or devices, although the danger might
thereby be greatly lessened.

2. The improper use of proper appliances to prevent the escape
of sparks from the smokestack of a steamboat must be dis-
tinctly averred in order to be available as a ground of recov-
ery in a suit for the loss of property set on fire, as claimed,
by sparks thus emitted.

3. Where, in such a suit, the sole theory of the plaintiff is that
reasonable care and precaution, under the common law,
required the defendant to provide the smokestack of its steam-
boat with a screen or spark arrester, and that its failure to do
so caused the fire complained of, and the theory of the defend-
ant, which is supported by evidence, is that it did provide
suitable appliances, in dampers and a flue cap, to prevent the
escape of sparks, and that they were as effective as a screen,
if not more so, as preventives, it is entitled to an instruc-
tion that if the jury find that the steamboat was so equipped
that, by closing her dampers and opening the flue cap, no
sparks or fire sufficient to have set the plaintiff's property on
fire could have escaped from said smokestack, the plaintiff
cannot recover, even though they find that the dampers were
not closed or the flue cap open.

4. The effect of such a request, if given, is entirely negatived by
the additional instruction that the jury must further find "that
the use of ordinary care did not require the defendant, in
addition, to have the smokestack of its boat equipped with a
fire screen to prevent the escape of sparks."

5. The act of Congress (U. S. Rev. Stat. chap. 1, 2, title 52), and
the regulations adopted thereunder by the board of supervis-
ing inspectors, relating to the equipment of vessels engaged in

interstate commerce upon our lakes and rivers, do not abrogate all the rules of the common law relative to liability for injuries inflicted by the negligence of vessel owners in not supplying their vessels with appliances which common experience has shown to be requisite for the proper protection of persons and property upon shore, and the use of which would not endanger the safety of persons and property on board.

6. A spark arrester is not an "instrument, machine, or equipment," within the meaning of U. S. Rev. Stat. §§ 4400, 4491, which provide that no kind of instrument, machine, or equipment for the better security of life, provided by the act of which said sections are a part, shall be used on any steam vessel navigating any waters of the United States which are common highways of commerce, or open to general or competitive navigation, excepting public vessels of the United States, vessels of other countries, and boats propelled in whole or in part by steam for navigating canals, which shall not first be approved by the board of supervising inspectors, and also by the Secretary of the Treasury

7. The first duty of a vessel owner is the protection of those on board, and who are directly under his care, and any device, appliance, or equipment which endangers them cannot be required by law, no matter how great the protection it would furnish to the property on the shore; and when the dangerous character of such devices is in issue, and the evidence is conflicting, the jury should be instructed that if they find the device, upon the use or absence of which an allegation of negligence is based, would be dangerous to the boat and to the property or persons on board, the law does not require its use.

Error to Cheboygan.    (Pailthorp, J.)    Argued January 17 and 18, 1894.    Decided April 10, 1894.

Case.    Defendant brings error.    Reversed.    The facts are stated in the opinion.

*Simonson, Gillett & Courtright* (*T. E. Tarsney,* of counsel), for appellant.

*Humphrey & Grant* (*Benton Hanchett,* of counsel), for plaintiff.

GRANT, J.   The plaintiff, a corporation, owned and operated a steam saw-mill on the east side of Cheboygan river, in the city and county of Cheboygan, Mich. On the west side was another mill. Lumber was piled on the docks on both sides of this river, the space between the docks and lumber piles being about 260 feet. Plaintiff's lumber was piled about 25 feet high above the water, and extending to the breakwater. All steamboats and vessels going to the city of Cheboygan passed between these lumber piles. The defendant, a corporation, owned several boats running between different points along the lakes, and was running one propeller, named the Minnie M., between Cheboygan and Sault Ste. Marie, Mich., and intermediate points, and was engaged in carrying both freight and passengers. This propeller had a Steeple compound engine, with the ordinary marine boiler for making steam, and burned pine slabs for fuel. She had no spark screen attached to her smokestack. About half past 4 o'clock on the morning of November 25, 1890, the propeller started on her last trip from Cheboygan to Sault Ste. Marie. No other boat, except one known as the George W. Cuyler, had been up or down the river that morning. It had passed before the Minnie M., but burned coal, and there is no evidence from which it can fairly be inferred that it caused the fire now complained of. The plaintiff introduced evidence tending to show that the Minnie M., on the morning in question, emitted an unusual amount of sparks from her smokestack; that a strong wind, amounting almost to a gale, was blowing to the eastward; that the sparks were blown by the wind onto the lumber piles of the plaintiff; that within from 10 to 20 minutes afterwards the lumber was on fire; and that the boat, as it went out, drifted towards the plaintiff's docks.

The declaration contains three counts: The first count

is based on Act No. 183, Laws of 1881, which requires the owners and masters of steam vessels navigating the waters of this State to provide fire screens for their smokestacks, and makes the owners liable for any damages resulting from the neglect to comply with the act.    The second count is not based upon the statute, but charges the defendant with negligence in having no fire screens attached to its smokestack, to prevent the escape of fire and sparks therefrom.    The third count is also based upon the statute.

The evidence on the part of the defendant tended to show that at the time in question the smokestack emitted no sparks; that the use of fire screens upon the smokestack of a vessel was impracticable and dangerous; that it was so equipped that, by closing the dampers and opening the flue cap, danger from sparks was avoided; that the dampers were closed and the flue cap open; and that these were reasonable and common appliances to prevent the escape of sparks.    Plaintiff, in rebuttal, gave evidence tending to prove that spark screens were used upon the smokestacks of steam vessels, and that there was no danger in using them for the short time required to pass up and down the Cheboygan river.

At the close of the evidence, counsel for the plaintiff announced that it sought to recover under the second count only; claiming that it was based upon the common law, and not upon the statute.    Counsel further stated, in the same connection:

"There is no occasion to say anything to the jury on the subject of that statute.    It is in no way or manner so presented in the trial of this case, and it is merely a question here of submission to the jury, under the circumstances of the case,—the law requiring reasonable care to be used,—whether, in the exercise of that reasonable care, it was the defendant's duty to use a spark catcher attached to the smokestack, and without doing that the defendant exercised reasonable care, or whether, by failure to adopt that measure as reasonable care, the injury occurred."

Counsel for the defendant requested an instruction that the plaintiff was not entitled to recover under either count of the declaration. Also that—

"The Minnie M., on the day alleged in the declaration, being engaged in interstate commerce, is not liable for any damages she may have caused by reason of not having a fire screen attached to her smokestack, as required by Act. No. 183 of the Laws of 1881, such act being an attempted regulation of interstate commerce; and the plaintiff cannot, therefore, recover."

Also:

"The laws and regulations passed by Congress, regulating steam vessels, contain no provisions requiring fire screens to be attached to the smokestacks of steam vessels; and the Minnie M., on the date alleged in the declaration, being engaged in interstate commerce, her owners and masters were not bound to have such an appliance on its smokestack."

Also:

"Under the evidence in this case, it appears that, if the Minnie M. had been provided with a fire screen attached to her smokestack, adequate provision could not have been made to prevent sparks and flames from being driven back through the fire door into the vessel, and thus endangering the vessel, its cargo and passengers. The plaintiff cannot, therefore, recover."

Also:

"It appearing from the undisputed testimony in this case that the Minnie M., on the date in question, was provided with devices and appliances that would have as effectually prevented the escape of sparks as would a fire screen attached to the smokestack of the vessel, as required by the statute. and that a fire screen attached to the smokestack would not more effectually have prevented the escape of sparks, the plaintiff cannot recover."

Also:

"It appearing from the undisputed testimony in this case that the use of fire screens attached to the smokestack of steam vessels is not consistent with the safety of

the boat, in that, by getting clogged, it operates as a damper and tends to obstruct the draught through the smokestack, and thus interfere with the motive power of the boat, and that it has been found impracticable to use it, and that there is danger of its causing the flames and sparks to be set back through the fire door, and thus to endanger the boat, her cargo, and the lives of passengers, defendant was not required to provide the said vessel with any fire screen, as required by the provisions of Act No. 183, Laws of 1881, and the plaintiff cannot, therefore, recover."

Also:

"If the jury find that on the morning of November 25, 1890, when the Minnie M. left the dock, and went down and out of the Cheboygan river, she was so equipped that, by closing her dampers and opening the flue cap, no spark or fire sufficient to do injury to property, or set it on fire, could escape from her smokestack, the plaintiff cannot recover, even though you find that the dampers were not closed or the flue cap open."

These instructions were refused by the court.

In its oral charge, the court read to the jury the second count of the declaration; stated the claims of the respective parties; instructed them that, if they should find that the fire did not originate from the sparks escaping from the defendant's boat, they should find for the defendant; and that the burden of proof was upon the plaintiff. The court then instructed the jury as follows:

"It was the duty of the defendant, in the operation of its steamboat the Minnie M. on the Cheboygan river, while passing the plaintiff's property, to use reasonable care to avoid setting fire to the plaintiff's property by sparks or fire escaping from the smokestack of the steamboat. It is for the jury to determine what would be reasonable care, under the circumstances. In determining what would be reasonable care, the jury are to take into account the danger which was incurred by sparks or fire escaping from the smokestack, in setting fire to the plaintiff's property. In determining that, the jury may take into account the character of the steamboat; the fuel

used; the manner in which the boat was managed by the crew; the likelihood of sparks to escape from the smokestack, with the danger of setting fire when they escaped; the plaintiff's property; its situation; the character of the season, as to being wet or dry; also, how near the plaintiff's property the boat passed, and the conditions and circumstances which the evidence shows in relation to what danger there was, if any, to setting fire to plaintiff's property from sparks or fire escaping from the defendant's smokestack. In determining what would be reasonable care to be used by the defendant, the jury may take into account the means of care which the evidence shows the defendant did use, and the evidence given in the case in relation to the use of spark screens attached to the smokestack of steamboats as a means of preventing the escape of sparks and fire, and to avoid the dangers arising therefrom. If you shall find from the evidence that it was, under the circumstances of this case, the duty of the defendant, as a means of using reasonable care, to use a spark screen attached to the smokestack of the steamboat while passing the plaintiff's property, and if you find that the defendant did not use any such spark screen, and by its neglect to use it the defendant did not use reasonable care, and, by such neglect to use such spark screen, sparks and fire escaped from the smokestack, and fell upon the plaintiff's docks, lumber piles, and tramways, and by means whereof the plaintiff's docks, lumber piles, and tramways were burned and destroyed, the plaintiff is entitled to recover for the damage suffered by it thereby. If, on the other hand, you find that upon the morning of November 25, 1890, when the Minnie M. left her dock, and went down and out of the Cheboygan river, she was so equipped that, by closing her dampers and opening the flue cap, no sparks or fire sufficient to do injury to the property, or set it on fire, could escape from her smokestack, and that the use of ordinary care did not require the defendant, in addition, to have the smokestack of its boat equipped with a fire screen to prevent the escape of sparks, then the plaintiff cannot recover, even though you find that the dampers were not closed or the flue cap open. In other words, you will determine from the evidence in the case whether the mere fact of having that boat equipped with a damper and flue cap, in the absence of a screen in the smokestack, was negligence or not, or whether due care, under the instructions I have already

given you, required them, in addition, to have a screen in the smokestack of its propeller."

The jury rendered a verdict for the plaintiff for $14,000.

1. The only ground of negligence upon which recovery is now sought is the failure of the defendant to supply the smokestack of its boat with a spark arrester. The plaintiff, by abandoning its first and third counts, and electing to rest its claim upon the second count, based upon the common law, eliminated from the case the statute of this State requiring spark arresters to be placed upon the smokestacks of steam vessels. This statute, therefore, is not before us for construction; and we need not discuss its validity, or whether it is in conflict with the laws of the United States. Were it before us, important and doubtful questions would be presented for determination.

All the material facts in the case were disputed, and the evidence in regard to them is conflicting. We need not, therefore, refer to them, except in their bearing upon the charge of the court, and the refusal to instruct as requested by the defendant. No question is raised upon the admission of evidence, and if the charge of the court is correct, the verdict must be sustained, unless the law of Congress has abrogated the rule of the common law.

It is argued by the learned counsel for the defendant that the record establishes conclusively the fact that the dampers of the boiler were closed, and the flue cap open, from the time that the boat left her dock until she passed the lumber piles, and entered the Straits of Mackinaw. Defendant had introduced evidence, of a very positive character, showing that there was no danger from sparks, if the dampers were closed and the flue cap open, and that the proper use of the dampers and flue cap was one of the most effective means known to prevent the escape of sparks. Some of its witnesses testified on cross-examination that, if a large volume of sparks came from the smokestack, there

was some mistake about the dampers being closed and the flue cap being open, and that, when a large volume of sparks is being emitted, it shows that they are putting in a new fire, or that it is being stirred up, and they are forcing it by artificial draughts. If, therefore, the witnesses on behalf of plaintiff testified truly as to the amount of sparks which were being emitted, one of two conclusions must have been reached by the jury,—either that the dampers and flue cap were ineffective when properly used, or that they were improperly or carelessly used by the defendant's employés. While the latter conclusion may seem more probable, still the conclusion to be drawn was for the jury, and not for the court. It is true that there was nothing in the record to contradict the evidence of the employés on board the boat that the dampers were closed and the flue cap open, or the evidence as to the effectiveness of the appliance used, except the fact—if proven by the plaintiff's evidence— that the sparks did issue from the smokestack in large and unusual quantities, and of unusual size. But this created a conflict of evidence. The fact that sparks were pouring out in such quantities is not consistent with the evidence of the defendant, upon either of its theories. *Alpern v. Churchill,* 53 Mich. 613.

The general rule of diligence applicable to the case is not in doubt. It was, in general terms, correctly stated by the circuit judge to be "the use of reasonable care to avoid setting fire to the plaintiff's property by sparks or fire escaping from the smokestack of the steamboat." It must be borne in mind that it is probably impossible to prevent, entirely, the escape of sparks, where wood is used for fuel; that the defendant was engaged in a lawful business; that it was lawful for it to use wood for fuel; and that the fact that a fire resulted is not, of itself, evidence of negligence. Yet appliances should be used which experience has shown to be reasonably effective in avoiding danger.

Such is the rule at the common law.   One is not under the legal duty to use the most effective means known, and, if he use an appliance or device which experience has shown to be reasonably effective in accomplishing the result, he is not required to use any additional appliances or devices, although the danger might thereby be greatly lessened.   If he is negligent in the use of the proper appliances, provided an injury results, another ground of liability arises, viz., negligence in the improper use of proper appliances.   But this negligence must be distinctly averred. Now, the theory of the plaintiff was that reasonable care and precaution, under the common law, required the defendant to provide its smokestack with a screen or spark arrester, and that the failure to provide it caused the fire.   The theory of the defendant, on the other hand, was that it had provided suitable appliances, in dampers and a flue cap, which were as effective as the screen, if not more so, in preventing the escape of fire and sparks.   Each introduced evidence in support of its theory.   Each was entitled to have the case submitted to the jury upon its theory, and the evidence in support thereof.   The case was submitted on the theory of the plaintiff, but we think that the theory of the defendant was practically excluded from the consideration of the jury.   One witness on behalf of the defendant, who had been engaged in the vessel business all his life, and had been master of vessels for eight years, testified:

"With the dampers closed and the flue cap open, the screen would be of no use, because there would be nothing for it to catch."

Another, of still larger experience, testified:

"The best-known device to prevent the escape of sparks from the smokestack of a marine boiler is to close the dampers and open the flue cap.   When the damper is closed, it acts as a spark arrester; and, when the flue cap

is open, it stops the draught from coming up through the fire, by allowing cold air to come up and fill the stack."

If this testimony was true,—and this was a question for the jury,—then it is clear that no further or other appliances were required, and the defendant had, in thus equipping its boat, performed its entire duty. The defendant was therefore entitled to have the following request given to the jury:

"If the jury find that on the morning of November 25, 1890, when the Minnie M. left the dock, and went down and out of the Cheboygan river, she was so equipped that, by closing her dampers and opening the flue cap, no spark or fire sufficient to do injury to property, or set it on fire, could escape from her smokestack, t he plaintiff cannot recover, even though you find that the dampers were not closed or the flue cap open."

The court gave this request, but its effect was entirely negatived by the additional instruction that the jury must further find " that the use of ordinary care did not require the defendant, in addition, to have the smokestack of its boat equipped with a fire screen to prevent the escape of sparks."

How could the use of ordinary care require an additional appliance, when those in use were sufficient to prevent the escape of sparks which could have set the plaintiff's property on fire? The reason for this request more clearly appears in view of the strong, if not uncontradicted, evidence in the record that the spark arrester is a detriment to the boat; that it easily and quickly becomes clogged with sparks; that it checks the draught; that the wires, alone, occupy about one-third of the area of the stack; and that its use is to be avoided, when possible. Mr. Kitchen, a witness for plaintiff, with 14 years' experience as master of steam vessels, testified on cross-examination that he did not think it was for the best interests of a boat to have one; that it interfered materially with the

motive power of the boat, caused extra labor on the part
of the crew, and, in a large furnace, would endanger a man
standing close to it, where his duties called him.     Mr.
Harrington, an engineer, a witness for plaintiff, who had
had 10 years' experience in burning slabs in the furnaces
of boats, testified that with a low-pressure boat and a con-
densing engine, and without any artificial draught, gener-
ally no sparks would be emitted, and those which did come
out would be small, and the heavier the wind the quicker
they would burn up.     It is unimportant to refer to the
evidence in contravention of the above. It is essential to refer
to that on the part of the defendant to show the relevancy
of the instruction asked, and the importance of so instruct-
ing the jury.     The charge, as given, virtually said to the
jury that, though they might find the means used reason-
ably effective, yet they were at liberty to find that another
device, in addition, should have been used.     This was error,
for which the case must be reversed.

2. It is further argued, on behalf of the defendant, that
its boat was equipped and provided with all the machinery
and mechanical appliances required by the act of Congress,
and the regulations adopted thereunder by the board of
supervising inspectors; that this legislation covers the
entire subject of the equipment of vessels engaged in inter-
state commerce upon our lakes and rivers, and abrogates
all the requirements of, and therefore excludes all liability
which exists at, the common law.     It is conceded that, in
the absence of federal legislation, the common-law rules
relative to the protection of the property of citizens may
be enforced in the state courts.     Reliance is placed upon
chapters 1 and 2 of title 52 of the Revised Statutes of the
United States,—particularly on the following sections:

"SEC 4400. All steam vessels navigating any waters of
the United States which are common highways of com-
merce, or open to general or competitive navigation,

excepting public vessels of the United States, vessels of other countries, and boats propelled in whole or in part by steam for navigating canals, shall be subject to the provisions of this title."

"SEC. 4405. * * * The board [of supervising inspectors] shall establish all necessary regulations required to carry out in the most effective manner the provisions of this title, and such regulations, when approved by the Secretary of the Treasury, shall have the force of law."

"SEC. 4470. Every steamer carrying passengers or freight shall be provided with suitable pipes and valves attached to the boiler, to convey steam into the hold and the different compartments thereof, to extinguish fire; and every stove used on board of any such vessel shall be well and securely fastened, so as to prevent it from being removed or overthrown, and all wood-work or other ignitable substances about the boilers, chimneys, cook-houses, and stove-pipes exposed to ignition, shall be thoroughly shielded by some incombustible material, in such a manner as to leave the air to circulate freely between such material and wood-work or other ignitable substance; and, before granting a certificate of inspection, the inspector shall require all other necessary provisions to be made throughout such vessel to guard against loss or danger from fire."

"SEC. 4491. No kind of instrument, machine, or equipment for the better security of life, provided for by this title, shall be used on any steam vessel which shall not first be approved by the board of supervising inspectors, and also by the Secretary of the Treasury."

"SEC. 4500. The penalty for the violation of any provision of this title, not otherwise specially provided for, shall be a fine of $500, recoverable one-half for the use of the informer."

The boat was duly licensed as an enrolled vessel, "to carry on the coasting and foreign trade on the northern, northeastern, and northwestern frontier, otherwise than by sea, for one year," and had received her certificate of inspection, in which the particulars of inspection are enumerated, and her equipment stated. Among the appliances and equipment required, no reference whatever is made to dampers, flue caps, or spark arresters.

It is manifest that the purpose of the United States

statute is the protection of the boat, its passengers, crew, and freight. None of the provisions of the law show any intent to legislate upon, or provide for, the protection of persons and property on land. If we look to the regulations adopted by the board of inspectors, the same purpose is manifest. Nothing enumerated in the certificate of inspection conflicts with the common-law rule as to the duty which is imposed by the common law in regard to the protection of persons and property upon shore, and within the jurisdiction of the respective states. It would seem, therefore, to be a reasonable conclusion that it was not the intention of Congress to abrogate all the rules of the common law relative to liability for injuries inflicted by the negligence of vessel owners in not supplying their vessels with appliances which common experience has shown to be requisite for the proper protection of persons and property upon shore, and the use of which would not endanger the safety of persons and property on board. It is a matter of common knowledge that steam vessels using wood for fuel, and traversing the public highways of commerce, which are often narrow, upon whose banks is, and of necessity must be, placed valuable and combustible property, are a source of danger. The intent to take away this liability, as well as the right of the state to enact laws for the protection of the lives and property of its citizens, should clearly appear. Here, again, the distinction between a failure to furnish proper appliances and the negligent use of proper appliances furnished must be remembered. In the latter case the common-law liability remains, unless the act is a maritime tort, over which the admiralty courts have exclusive jurisdiction. So, if it should be found that the defendant's dampers and flue cap were reasonably sufficient to prevent the escape of sparks, but that the negligent and careless use of them, or the failure to close the one and open the other, set

fire to, and caused the destruction of, plaintiff's property on shore, the defendant's liability at the common law, under a proper declaration, would be clearly established.

It is argued that the defendant is prohibited, impliedly if not expressly, by section 4491, from using a spark arrester, and that, if it did so without the approval of the board of supervising inspectors and the Secretary of the Treasury, it would be liable to a penalty of $500, under section 4500. But, as already stated, both the law and the regulations are silent as to its use, and we do not think that a spark arrester is an "instrument, machine, or equipment" designed or intended "for the better security of life," within the meaning of the law. Furthermore, the object of the act of which these sections are a part is stated in the title "to provide for the better security of life on board of vessels propelled in whole or in part by steam." We are aided to this conclusion by the fact appearing upon this record that many steam vessels have used them, that others are still using them, and the knowledge, obtained from the judicial decisions in our own and in other states, that they have for many years been in common use upon railroad engines, mill stacks, and vessels navigating our rivers and lakes. There is no evidence upon this record to show, nor have we any information or knowledge, that there is more difficulty in using them upon mills and railroads than there is upon vessels. So common has been their use upon vessels that we are justified in taking judicial knowledge of the fact that the United States inspectors, whose duty it is to inspect vessels from time to time, must have had knowledge of their existence, and have not considered them dangerous to the safety of a vessel, or they would have prohibited their use. At least, this is a fair presumption, and must hold until the contrary appears.

We cannot, therefore, hold that the act of Congress

relieves the defendant from its liability at the common law, and its duty to use appliances which experience has shown to be requisite, by common prudence, for the protection of property on the banks of the public highways traversed by its boats. Of course, the first duty of a vessel owner is the protection of those on board, and who are directly under his care. It follows that any device, appliance, or equipment which endangers them cannot be required by the law, no matter how great the protection it would furnish to the property on shore. When the dangerous character of such devices is in issue, and the evidence is conflicting, the jury should be very carefully and clearly instructed in the direction above indicated. They should be distinctly told that if they find the device, upon the use or absence of which negligence is based, is dangerous to the boat, and to the property and persons on board, the law does not require its use.

Of the many authorities cited in the briefs of counsel, mainly from the federal courts, no one involves facts parallel to those of the present case. Nearly all of the cases cited from the federal courts involve the statutes of the various states, which were claimed to be in conflict either with the laws or the Constitution of the United States.

In *Cuddy v. Horn*, 46 Mich. 596, the plaintiff recovered damages on account of the death of his decedent, caused by a collision between two vessels in the Detroit river. No question of jurisdiction appears to have been raised.

In *John Spry Lumber Co. v. Steam-Barge*, 76 Mich. 320, the jurisdiction of the State court was challenged. The injury was caused to the plaintiff's boom in St. Mary's river. We said in that case:

"Locality, by all the authorities, is the test in cases of tort by which to determine whether the wrongful act is one of admiralty cognizance."

And several authorities are there cited.

In *Johnson v. Elevator Co.*, 119 U. S. 388, the jib-boom of a vessel being towed in the Chicago river struck a building, injuring it, and causing the loss of personal property. Suit was brought in the state court, and it was held that that court had jurisdiction.

In *Sherlock v. Alling*, 93 U. S. 99, a collision occurred between two vessels on the Ohio river, within the terri-tory of the state of Indiana, by which a passenger was killed. His administrator was allowed to recover in the state court under a statute of that state allowing damages for torts resulting in the death of a person injured. It was claimed that by the common and maritime law the right of action for personal torts dies with the person injured, and that the statute enlarged the liability, and constituted a new burden on commerce. It was held to constitute no encroachment upon the commercial power of Congress. By parity of reasoning, a person injured would be entitled, under the common law, to maintain an action for injury in the state court.

In *King v. Transportation Co.*, 1 Flip. 1, it was held that the act of Congress of March 3, 1851, limiting the liability of vessel owners to the value of the interest of such owners in the same, did not apply to damage done by a vessel to property situated on land, such as the burn-ing of a warehouse by sparks proceeding from the chim-ney of a steam tug. The language of that case seems so applicable to this case that we quote from it as follows:

"Each state has exclusive control over all matters per-taining to its own internal police. It can establish and regulate ferries across its rivers, control the moving of vessels in harbors within its borders, and enact health and inspection laws, which, by quarantine or otherwise, may operate on persons brought within its jurisdiction in the course of commercial operations. The Supreme Court of the United States, in the case of *City of New York v. Miln*, 11 Pet. 139, broadly declared the doctrine that a

state has the same undeniable and unlimited jurisdiction over all persons and things within its territorial limits as any foreign nation, where that jurisdiction is not surrendered or restrained by the Constitution of the United States; that by virtue of this it is not only the right, but the bounden and solemn duty, of a state, to advance the safety, happiness, and prosperity of its people, and to provide for its general welfare, by any and every act of legislation, *or by the rocognition of the principles of the common law,* which it may deem to be conducive to these ends, where the power over the particular subject, or the manner of its exercise, is not restrained by or surrendered to the federal government, and that all those powers which relate mainly to municipal law, or what may, perhaps, more properly be called 'internal police,' are not thus restrained and surrendered; and that consequently, in relation to these, the authority of a state is complete, unqualified, and exclusive."

In *Transportation Co. v. Gagnon*, 36 Fed. Rep. 123, it was held that the statute limiting the liability of ship owners to their interest in the vessel and its freight "for any embezzlement, loss, or destruction by any person of any property * * * shipped or put on board, * * * or for any act, matter, or thing, loss, damage, or forfeiture done, occasioned, or incurred without the privity or knowledge of such owner or owners," did not include liability for the destruction of buildings and goods on the land by fire alleged to have been communicated by a vessel, though duly licensed and engaged in the coast trade.

Many other similar decisions might be cited, but we deem it unnecessary. While most of these cases do not involve the appliances or equipment of vessels, but are cases of the negligent use or management of properly equipped vessels, still we think the principle there enunciated applies to the present case.

Judgment must be reversed, and a new trial ordered.

The other Justices concurred.