BURROWS *v.* DELTA TRANSPORTATION CO.

1. TRIAL—REMARKS OF COURT.

Where there is evidence fairly tending to establish the plaintiff's case, it is reversible error for the court to state, in the presence of the jury, that the testimony is so indefinite and unsatisfactory that it will not justify a verdict, although he finally permits the case to go to the jury.

2. CONSTITUTIONAL LAW—INTERSTATE COMMERCE—STEAM VESSELS— DUTY TO PROVIDE FIRE SCREENS.

The State may enact laws for the protection of the health, lives, and property of its people in respect to those subjects

over which Congress has the power to legislate, and such laws are valid and may be enforced so long as they do not conflict with Federal legislation. A vessel engaged in interstate commerce, therefore, is subject to the provisions of 1 How. Stat. § 2033, requiring steam vessels navigating the waters of this State to be provided with suitable fire screens, since said statute is not in conflict with the act of Congress relating to the equipment of steam vessels (Rev. Stat. U. S. chap. 1, 2, tit. 52) and the regulations adopted thereunder by the board of supervising inspectors.

3. Steam Vessels—Neglect to Supply Spark Screens—Setting Fires—Liability of Owner—Instructions.

1 How. Stat. §§ 2033, 2034, provide that all vessels using wood for fuel shall be supplied with fire screens "of the best approved kind, shown by experience to be proper and suitable for protection from fire," and that a vessel owner failing to comply with such requirement shall be liable for loss by fire occasioned by reason of his neglect. In an action under said statute there was evidence tending to show that there were fire screens in use having a mesh not exceeding one-quarter of an inch square, and that by the use of such screens all dangerous sparks were prevented from escaping. Plaintiff requested an instruction that if the jury should find that, by reason of defendant's neglect to provide his vessel with a suitable fire screen, sparks escaped from the smokestack, and set fire to and destroyed plaintiff's property, defendant would be liable. The request, as given, was qualified by the statement that it appeared from the testimony that the fire screen approved by witnesses had a mesh three-eighths to one-half an inch square; that, "if a fire screen of that kind would totally prevent this fire, I give you that request; but, if this fire should be set by the smaller sparks, I could not give it to you, because the statute says that the injury must be occasioned by the lack of the fire screen, and, if the fire screen did not prevent the small sparks shown by the testimony, there would be no liability." *Held:*

(1) That the jury should not have been permitted to consider whether the fire would have been prevented by using a screen with a half-inch mesh.

(2) That the instruction given was also improper in that it required the jury to find, not whether the fire was set by large sparks or small ones, but whether the use of such a screen would or would not have prevented the escape of small sparks.

(3) That the request as framed was proper, and should have been given.

4. Same.

It is error in such a case to instruct the jury that, in determining whether the use of a spark screen upon the smokestack would have prevented the fire, they may act on their own judgment, experience, and knowledge, instead of confining them to the evidence in the case.

5. Same.

Expert testimony as to the character of the sparks which, under certain circumstances, would come out of a smokestack, offered for the purpose of showing that the fire might have been set by another vessel than defendant's, is insufficient to justify a submission of that question to the jury, where the undisputed testimony is to the effect that at the time no sparks were coming from such other vessel.

6. Constitutional Law—Extent of Legislative Power.

A statute will not be declared unconstitutional and void solely on the ground of unjust and oppressive provisions, or because it is supposed to violate the natural, social, or political rights of the citizen, unless it can be shown that such injustice is prohibited or such rights guaranteed or protected by the Constitution.

7. Same—Title of Act—Steam Vessels—Duty to Provide Fire Screens.

Act No. 183, Pub. Acts 1881 (1 How. Stat. §§ 2033, 2034), entitled "An act to compel steam vessels navigating the waters of the State to provide fire screens for smokestacks, and to provide a penalty for its violation," is not unconstitutional as contravening section 20, art. 4, of the Constitution, providing that "no law shall embrace more than one object, which shall be expressed in its title," although it authorizes a recovery for damages sustained by reason of a failure to comply with its provisions. The term "penalty," as used in the title, is sufficiently broad to include the liability imposed for damages, as well as the liability to fine and imprisonment.

8. Same—Reasonableness.

The requirement of said act that the screens "shall be of the best approved kind, shown by experience to be proper and suitable for protection from fire," is not unreasonable, being no more burdensome than the requirement imposed by the common law under such circumstances. Neither the statute nor the common law, however, requires the use of any appliance that will endanger the vessel.

9. SAME—REPUGNANCY.

> The fact that the title to the act relates to "steam vessels" gen·
> erally, while section 1 requires "all vessels using wood for
> fuel" to be provided with fire screens, and section 2 imposes
> a liability upon the owner of "any steam vessel" who neglects
> to provide such screen, does not render the act repugnant in
> its terms, since it is clear that it is intended to apply only
> to steam vessels using wood for fuel.

Error to Bay; Maxwell, J.   Submitted June 14, 1895.
Decided October 1, 1895.

Case by George L. Burrows, survivor of himself and
Amasa Rust, deceased, against the Delta Transportation
Company, for the value of lumber destroyed by fire
alleged to have been set by sparks from defendant's ves-
sel.   From a judgment for defendant, plaintiff brings
error.   Reversed.

*Hanchett & Hanchett,* for appellant.

*Simonson, Gillett & Courtright (T. E. Tarsney,* of counsel).
for appellee.

LONG, J.   This action is brought under Act No. 183,
Pub. Acts 1881, entitled "An act to compel steam ves-
sels navigating the waters of the State to provide fire
screens for smokestacks, and to provide a penalty for its
violation," being sections 2033 and 2034, 1 How. Stat.

On November 25, 1890, the plaintiff and Amasa Rust,
since deceased, owned and had piled on the dock on the
east bank of the Cheboygan river, at Cheboygan, a large
quantity of pine lumber, of the value of $50,000 and up-
wards.   The lumber had stood upon the dock during the
summer, and had become seasoned and dry.   The de-
fendant owned and operated a steamboat called the
"Minnie M." which was run between Cheboygan and
Sault Ste. Marie, carrying freight and passengers, and
which used wood for fuel, and had no fire screen of any
kind attached to her smokestack.   On the morning of
November 25, 1890, the boat lay at McArthur's dock, on

the west side of the river, some 1,200 feet above the lumber in question; and, about 5 o'clock in the morning of that day, she was fired up with pine slabs, left the dock, and passed down the river on her course and by the lumber in question. The river at this point was about 220 feet wide. At the time of her passing, a strong wind was blowing from the west, and, about 15 or 20 minutes after the boat passed down, the lumber was seen to be on fire. It was entirely consumed.

The plaintiff, to establish his claim, called several witnesses, who testified substantially as follows:

Charles J. Kitchen: That he was master of the tug C. B. Strohn, which lay on the east side of the river, above the Minnie M.; that he saw the Minnie M. winding at McArthur's dock; that his attention was attracted to her by fire coming out of her smokestack; that there was a large volume of sparks escaping from the stack, going across the river, eastward; that he watched her until she got around with her stern pretty well up the river, watched her five or six minutes, may be longer; that there were lots of sparks coming from the Minnie M. at that time, more than there ordinarily are when they are starting up the fire; and that there were more sparks than he ever saw coming out of the smokestack of a steamboat.

Paul Verette: That he was a policeman for nearly six years in Cheboygan, and while on his watch, about half past 4 o'clock on that morning, he was standing on the bridge which was above where the Minnie M. lay; that he saw her as she was just leaving McArthur's dock, and saw her four or five minutes; that the sparks coming out of her smokestack drew his attention; that there was a lot of them, and there was a pretty high wind right across the river from the north-west towards the southeast; that the sparks coming out of the stack were going across the river among the lumber piles on the east side of the river; that, when he last saw the boat, she was passing Nelson's mill (Nelson's mill and the Cheboygan Lumber Company's mill are the same), and was throwing

sparks at that time which were going towards the lumber piles.   The sparks were coming out very thick, just the full of the smokestack.

Reuben H. Mosher:   That he was the captain of the tug Cuyler; that the tug passed down the river before the Minnie M., and came back, and tied up to the dock on the east side of the river, about 1,200 feet below the point where the fire broke out.   He was lying down in the tug Cuyler when the Minnie M. went by him.   About 15 minutes after the Minnie M. passed, he was called by Jarvis, who was aboard of the tug, and got up, and saw the fire in the first pile next to the mill.   It had just started, and was about 12 feet above the dock, and about 4 or 5 feet down from the top of the pile nearest to the front of the dock towards the river.

James Taunt:   That he was fireman on the tug Cuyler, and that, while she lay at the dock below the lumber, he came up on deck, and saw the Minnie M. go down the river as he came up.   She was somewhere about abreast of the Cheboygan Lumber Company's mill.   Sparks were coming out of her smokestack about the full of the smokestack.   He called the attention of Mr. Harrington, who also looked out.   Taunt continued to look at the Minnie M. until she passed the Cuyler.   The sparks which he saw coming from the smokestack were going right into the lumber on the east side of the river, into the two piles below the mill.

Dewitt C. Harrington, the engineer of the tug Cuyler, testified that Mr. Taunt called him out to see sparks coming out of the Minnie M.   He went on deck, and saw sparks coming out of the smokestack of the Minnie M., an unusual amount coming out,—some big ones and some little ones.   They were going across the river to the east side.   He continued to watch the boat until she got past the Cuyler.   The sparks continued to come out of her during the whole time she was going down the river.   As the sparks went to the east side of the river, some of them went onto the piles, some of them went into them,

and some over them. Some 10 or 15 minutes afterwards the alarm was given. He went on deck to see the fire. He saw sparks going in at about the place where the fire was in the lumber.

George Adams, who was engineer on the city waterworks, and was on watch at the waterworks at the time, testified that he saw the Minnie M. going down the river; saw her after she left the dock until she got out to the end of the lumber piles, going out of the river; and saw her throwing fire out of her smokestack, quite a good deal of it, during the whole time he saw her. About 15 or 20 minutes after the Minnie M. went down the river, he saw the fire in the lumber piles. The sparks, as he saw them coming out of the stack, were going across the river towards the lumber piles.

After the above witnesses had testified, the plaintiff called Thomas McGarraty, who had had 12 years' experience as captain of a tug, and who testified to the use of fire screens to prevent the escape of fire, and on the subject of the different kinds of screens used. At this point the court interposed, and the following took place:

"*The Court:* Have you got any more testimony as to the cause of the fire?

"*Counsel:* Oh, yes, sir.

"*The Court:* I went down on the bridge here [in Bay City] last night, and I looked up towards Twenty-Third street bridge. It is less than a mile and a half, and it seemed to me that the evidence in on that subject is too uncertain to base a verdict on it,—the evidence as to the setting of the fire to the lumber by the Minnie M.

"*Counsel:* We except to the statement of the court.

"*The Court:* It appears that the night, while not intensely dark, was not a moonlight night, cloudy, and the sky full of scuds, and a heavy wind. I don't think that anybody from either the upper part of the river, or where this tug laid, as marked on the map, can tell with any degree or even probability that the Minnie M. set that fire, from the testimony in.

"*Counsel:* We have offered as direct testimony upon that subject as we have.

"*The Court:* Have you offered it all?

"*Counsel:* We have not offered it all, but it is all of the same kind. There isn't any other testimony that we have that will bring it closer than that. We have evidence of other witnesses relatively in the same position that the witnesses who have sworn were to the same occurrences. If that is your honor's view, our testimony could only be made stronger by having more witnesses to the occurrences.

"*Counsel:* We except to the statement of the court.

"*The Court:* What have you to say about the right of the jury to base a verdict on what there is of it?

"*Counsel:* We simply say we think it is sufficient to show the cause of the fire absolutely and conclusively.

"*The Court:* Under the statement of counsel, I shall feel compelled— I don't think it would be doing my duty to allow a verdict on the testimony to stand in favor of the plaintiff, if one was obtained. You can take such course about it as you are a mind to, with that intimation. I shall feel in duty bound to instruct the jury as to the totally unsatisfactory species of evidence as to the cause of the fire. If boats on this river can be held liable upon such proof, there is no use of boats entering the Saginaw river. It would absolutely banish commerce upon this stream. Tugs are running around here, from here to the mouth of the river, and they never did, as a general thing, use spark arresters. The larger vessels never use them at all. They lie right here by the lumber docks, load lumber for days and weeks, and are passing up and down the stream every day; and I should want the most conclusive and direct proof of the fact of setting the fire, in order to allow a verdict in such case.

"*Counsel:* We except to the statement of the court.

"*The Court:* It appears from the testimony that the cut in the harbor is something more than a mile and a half.

"*Counsel:* Not over a mile.

"*The Court:* Very well. Twenty-Third street bridge is about a mile and sixty rods from the Third street bridge here. No mortal man can go onto the Third street bridge, and tell anything about the setting of fire up there, from the mere fact that sparks are escaping.

"*Counsel:* Don't understand us to concede that the witnesses were a mile away from the place.

"*The Court:* The first witness was on a bridge which

was some 900 feet from the mill, and that was some 400 feet from the place where the fire commenced.

"*Counsel:* No, 150 feet.

"*The Court:* I think it is some 1,400 feet from where the fire started. It is 150 feet beyond the slip leading from the rear of the mill. He was looking down that way. The other witness,—that was on the Strohn,—he saw the Cuyler pass him, and watched her outside. He noticed the boat when she was considerably,—this fire casting out a great many sparks; and she went out of the harbor throwing out more or less sparks. Now, it is a fact that, while all coal don't make sparks like soft wood or pine slabs, there is fire there, and occasionally fires are caught from coal sparks. Still, there is no proof that this boat emitted a spark within 500 feet of the place where the fire caught in the lumber at all in either direction. It is totally lacking in definiteness and certainty. I don't see anything certain about it. It may have been so, and that is all you can say of it.

"*Counsel:* Under this statement, the only thing that is left for us to do is to put our testimony in shape to save the question, for, after what your honor has said to the jury, it would be useless for us to go to them on the question of fact.

"*The Court:* You can put your offer or your claim in any shape that you are a mind to, and I will pass on it. I cannot try another case today unless the parties are ready. If you desire it, you can have time for conference together until later in the day. It may be that my experience with boats influences my judgment, but in my mind there is nothing to indicate that this boat set that fire.

"*Counsel:* Note an exception to the statement of the court.

"*Counsel to witness:* Where do I understand that you have used these spark screens on your tugs?

"*A.* At Muskegon, and in the Muskegon Lake. Spark screens on tugs are generally used at Muskegon; used on the smokestacks or in the smokestacks."

Several witnesses were thereafter called, who testified to having seen sparks from this boat falling upon the lumber; but this testimony was no more direct as to the origin of the fire than that above quoted. No evidence was given nor attempt made to account for the setting

of the fire other than by sparks from this boat. The only other boat passing down the river that morning was the tug Cuyler, which was burning coal for fuel, and which, plaintiff's testimony showed, did not throw sparks on that occasion.

Counsel for plaintiff then offered to show further, by several witnesses, that sparks were seen coming from the stack of the Minnie M., and passing over and upon the lumber, when the court remarked: "Another witness testified here that he saw the sparks going into or on the lumber, but his position was such that I don't regard it as of any consequence."

Defendant then offered testimony tending to contradict plaintiff's testimony, and to show that no sparks were coming out of the stack of the Minnie M. on that occasion, and to show that she was equipped with a damper and a flue cap, which were in order; that the damper was closed, and the flue cap open, when she passed down the river; and that, when in that condition, dangerous sparks would not escape from the smokestack.

Although the court had so commented upon the testimony of the witnesses for plaintiff, he finally concluded there was some evidence which the jury might consider as to the origin of the fire, and stated to counsel that he would so submit it. The plaintiff's case was so greatly prejudiced by these and other remarks of the court below that a new trial should be granted upon this branch of the case alone; and, in view of a new trial, we shall pass upon the other assignments of error.

The manager of the defendant company was called as a witness, and was permitted to testify that the Minnie M. ran in connection with the Detroit & Cleveland Steam Navigation Company (running from Detroit and Cleveland to Cheboygan and Mackinaw), the Northern Michigan Line (from Chicago), the Grummond Line (from Toledo, Cleveland, and Detroit), the Grand Rapids & Indiana Railroad (running from Indiana to Mackinaw), and the Michigan Central Railroad; that an arrangement

for a joint tariff had been made with the Grand Rapids & Indiana Railroad Company for carrying freight; that the Minnie M. carried freight and passengers on its line destined for points outside of Michigan, and from outside of the State destined for points along the line of its route in this State; also, that it had arrangements with each of these transportation lines in regard to carrying freight and passengers. This evidence was taken under the objection of plaintiff's counsel, and was introduced for the purpose of showing that the Minnie M. was engaged in interstate commerce, and therefore no recovery could be had.

This question was settled in *Cheboygan Lumber Co.* v. *Delta Transportation Co.*, 100 Mich. 16. In that case evidence was given upon the same point, and the following requests presented by the defendant:

"The Minnie M., on the day alleged in the declaration, being engaged in interstate commerce, is not liable for any damages she may have caused by reason of not having a fire screen attached to her smokestack, as required by Act No. 183 of the Laws of 1881, such act being an attempted regulation of interstate commerce; and the plaintiff cannot therefore recover."

Also:

"The laws and regulations passed by Congress regulating steam vessels contain no provisions requiring fire screens to be attached to the smokestacks of steam vessels; and the Minnie M., on the date alleged in the declaration, being engaged in interstate commerce, her owners and masters were not bound to have such an appliance on its smokestack."

These requests were refused, and this court, in considering that question, held that the fact that the boat was engaged in interstate commerce, and that it was enrolled, and equipped and provided with all the machinery and mechanical appliances required by the act of Congress and the regulations adopted thereunder by the board of supervising inspectors, did not relieve the owners of the vessel from their liability, under the common law, for

injuries done by fire escaping from the smokestack of the vessel; and that they would be liable for such injury, arising from a failure to use a fire screen in the smokestack, although such fire screen was not required by the laws of Congress or the rules of the supervising inspectors, if reasonable care at the common law required the use of such fire screen.   After considering the provisions of the act of Congress, it was said:

"We cannot, therefore, hold that the act of Congress relieves the defendant from its liability at the common law, and its duty to use appliances which experience has shown to be requisite, by common prudence, for the protection of property on the banks of the public highways traversed by its boats."

The principle in that case was that the legislation of Congress had not excluded the application of the common law upon this subject in reference to the operation of steamboats; that the common law existing in this State continues in force, notwithstanding the legislation of Congress, so long as the law enacted by Congress and the law of the State do not conflict.

That case, however, was brought upon the common-law liability of the defendant to answer for its negligence in setting the fire.   In the present case suit is brought upon the statute, which provides:

"Section 1.   That all vessels using wood for fuel, navigating any of the waters of this State, shall be provided with suitable fire screens attached to the smokestack of such vessels to prevent the escape of fire.   Such fire screens shall be of the best approved kind, shown by experience to be proper and suitable for protection from fire.

"Sec. 2.   The owner or owners and master of any steam vessel navigating the waters of this State who shall neglect to provide his or their vessel with the fire screens attached to the smokestacks of said vessels, as mentioned in section one of this act, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of one hundred dollars, or by

confinement in the county jail not exceeding thirty days, or by both such fine and imprisonment, in the discretion of the court. * * * The owner of such vessels shall also, when any person is injured in person or property by reason of fire occasioned by the neglect of such owners of such vessels to comply with the provisions of section one of this act, be liable to the amount of damages sustained to the person so injured, to be recovered in any court of competent jurisdiction in this State."

But the common law is no more and no less a particular law of the State than this act of the legislature; and, if the omission to employ means for the protection of property which are required by the common law creates a liability, the omission to employ the same means or like means required by the provisions of a statute of the State would create a like liability, since the statute is no more in conflict with the law of Congress than is the common law of the State in conflict with it. The common law of the State and a statute of the State are in the same sense laws of the State. *Smith* v. *Alabama*, 124 U. S. 475. The principle has received abundant adjudication that the State may exercise its power to make regulations for the protection of the health, the lives, and the property of the people of the State against the dangers arising under interstate transportation and commerce, concurrent with laws passed by Congress in the exercise of the jurisdiction of Congress over the same subjects, and that the laws of the State are valid and may be enforced so long as they do not conflict with the provisions of Federal legislation. *King* v. *Transportation Co.*, 1 Flip. 1; *City of New York* v. *Miln*, 11 Pet. 102; *Goodrich Transportation Co.* v. *Gagnon*, 36 Fed. 123; *Johnson* v. *Elevator Co.*, 119 U. S. 388, at pages 399, 400; *Transportation Co.* v. *City of Parkersburg*, 107 U. S. 691, at pages 700-707; *County of Mobile* v. *Kimball*, 102 U. S. 691; *Huse* v. *Glover*, 119 U. S. 543; *Sands* v. *Improvement Co.*, 123 U. S. 288; *Morgan's Steamship Co.* v. *Board of Health*, 118 U. S. 455; *Sherlock* v. *Alling*, 93 U. S. 99; *Harrigan* v. *Lumber Co.*, 129 Mass. 580;

*People* v. *Jenkins,* 1 Hill, 469; *Smith* v. *Alabama,* 124 U. S. 465.

It was held in *Cheboygan Lumber Co.* v. *Delta Transportation Co., supra,* that, by the common law of this State, appliances should be used which experience has shown to be reasonably effective in avoiding danger, and that none of the provisions of the act of Congress show any intent to legislate upon or provide for the protection of persons or property on land. It was said:

"If we look to the regulations adopted by the board of inspectors, the same purpose is manifest. Nothing enumerated in the certificate of inspection conflicts with the common-law rule as to the duty which is imposed by the common law in regard to the protection of persons and property upon shore and within the jurisdiction of the respective States. It would seem, therefore, to be a reasonable conclusion that it was not the intention of Congress to abrogate all the rules of the common law relative to liability for injuries inflicted by the negligence of vessel owners in not supplying their vessels with appliances which common experience has shown to be requisite for the proper protection of persons and property upon shore, and the use of which would not endanger the safety of persons and property on board."

The act under which the present suit is brought was passed nearly 15 years ago, and with the provisions of which, it is apparent, many vessels navigating the waters of the State have complied, and we find nothing in the act of Congress or the regulations of the supervising inspectors in conflict therewith; and what was said in *Cheboygan Lumber Co.* v. *Delta Transportation Co.* is equally applicable in the present case, though the action is brought under the statute, and not in reliance upon the common-law liability. Railroad companies running their trains are as much engaged in interstate commerce as is the defendant in running this steamboat between Cheboygan and Sault Ste. Marie. The various States have enacted statutes requiring specific precautions to be taken in running trains, for the purpose of protecting

life and property in the State against dangers arising from the operation of railroads. These statutory regulations are upheld against the objection made that the railroads affected by such regulations are engaged in interstate commerce. *Smith* v. *Alabama*, 124 U. S. 465; *Nashville, etc., R. Co.* v. *Alabama*, 128 U. S. 96; *Union Pacific R. Co.* v. *De Busk*, 12 Colo. 294; *McCandless* v. *Railroad Co.*, 38 S. C. 103; *Hennington* v. *State*, 90 Ga. 396; *Western Union Telegraph Co.* v. *Tyler*, 90 Va. 297.

The court was therefore in error in permitting this testimony, as it was wholly irrelevant and incompetent. It had no place in the case. There is nothing in the fact that the boat was engaged in interstate commerce which in any manner affected the question of the defendant's liability.

The plaintiff requested the court to charge as follows:

"It is admitted in this case by the defendant that on the 25th day of November, 1890, the defendant was the owner of the vessel called the 'Minnie M.;' that she was then operated by the defendant, and was engaged in navigating the Cheboygan river; and that her route extended from Cheboygan to Sault Ste. Marie, in the State of Michigan, and that on that route she carried freight and passengers, stopping also at intermediate points in the State. It is further admitted by the defendant that she had no fire screen attached to the smokestack of the vessel to prevent the escape of fire. The evidence in this case is undisputed that on the morning of November 25, 1890, she left McArthur's dock, in Cheboygan, passing down the Cheboygan river on her route, going by the place where the plaintiff's lumber was situated, and that, after she had passed by the lumber, fire was discovered in the lumber, which spread and consumed the lumber. If the jury find that by reason of the neglect of the defendant to provide the said vessel with a suitable fire screen attached to her smokestack, to prevent the escape of fire, fire or sparks escaped from the smokestack of the vessel, and fell upon the lumber, and caused it to be set on fire and to be burned and destroyed, the defendant is liable to the plaintiff to the amount of the damage thereby sustained by the plaintiff."

The court declined to give the request as presented, but gave it with this additional qualification:

"It appears from the testimony that this fire screen that is approved of by these masters who have testified about it has a mesh of iron three-eighths to half an inch square. If a fire screen of that kind would totally prevent this fire, I give you that request. But, if this fire should be set by the smaller sparks, I could not give it to you, because the statute says that the injury must be occasioned by the lack of the fire screen, and, if the fire screen did not prevent the small sparks shown by the testimony, there would be no liability."

The testimony on the part of plaintiff in respect to the spark screens which were used on vessels, and the size of the mesh of those screens, was given by Charles J. Kitchen, who describes the butterfly screen as a screen placed inside of the smokestack, and opened and closed by a lever, the size of the mesh used being a quarter of an inch; Thomas McGarraty, who testified to the use of a bonnet screen, and gives the size of the mesh as a quarter of an inch; James Smith, who testified in relation to the butterfly screen, and gave the size of the mesh as a quarter of an inch; Charles Robinson, who gave the size of the mesh of the same kind of screen as about a quarter of an inch; and Albert Todd and John McLaughlin, who testified as to the use of the butterfly screen, but did not give the size of the mesh,—from which evidence on the part of the plaintiff it will be seen that there was no foundation for the statement of the court that "it appears from the testimony that this fire screen that is approved of by these masters who have testified about it has a mesh of iron three-eighths to half an inch square." The request should not have been qualified by any such statement. The jury had no right to consider whether the fire would have been prevented by using a screen with a mesh a half an inch square.

The latter statement of the court that, "if this fire should be set by the smaller sparks, I could not give it

to you, because the statute says that the injury must be occasioned by the lack of the fire screen, and, if the fire screen did not prevent the small sparks shown by the testimony, there would be no liability," taken in connection with the statement that the fire screen that had been approved by the masters who had testified had a mesh half an inch square, and, if a fire screen of that kind would totally prevent the fire, he would give the request, conveyed to the jury the idea that, if a fire screen having a mesh a half an inch square did not prevent the escape of small sparks, there would be no liability on the part of the defendant, and put the case to them so that they were required to find, not whether the fire was set by large sparks or small ones, but whether the use of a fire screen having a mesh a half an inch square did or did not prevent small sparks from escaping.

The request as framed covered correctly the question, and should have been submitted to the jury. The evidence described two different kinds of screens,—the butterfly screen and the bonnet screen. It described screens having a mesh not exceeding one-quarter inch, and also tended to show that by the use of such screens all dangerous sparks were prevented from escaping. The statute under which the action is brought required that vessels should be provided with screens that "shall be of the best approved kind, shown by experience to be proper and suitable for protection from fire." It was for the jury to determine from the evidence which of the various screens shown to have been used was the best approved kind, proper and suitable for protection from fire.

After describing to the jury the size of the meshes of the screen which they were to take into account, the court charged the jury as follows:

"Now, if from your judgment and experience and knowledge, or better understanding of the testimony, you can say that there were large sparks that ought to have been arrested by the spark catcher, you can find a ver-

dict for the plaintiff; otherwise, you will find that there is no cause of action. The whole right to recover depends on this fire happening, being occasioned by sparks that would have been checked by this spark arrester."

This charge is a direction to the jury that they may determine the question of fact involved as to whether the employment of a screen upon the smokestack would have prevented the fire, by acting on their own judgment and experience and knowledge. They should have been directed that they were to determine the facts in the case, not from their judgment or experience or knowledge, but from the testimony given by the witnesses on the trial of the case.

The court also charged the jury:

"You will also consider in that connection the evidence in regard to the Cuyler. She went down the river, and she had banked up her fires in the evening before; she had put fresh coal on, and shut the damper. According to this expert from Milwaukee, the effect of that was to coke the coal, which rendered it light and easy for it to fly, to be burned and thrown up in sparks, and that these sparks would last a long time,—longer than wood, I think he stated."

This evidence referred to as given by the expert from Milwaukee is in the testimony of the defendant's witness John V. Tuttle, the whole of which is as follows:

"*Q.* Suppose a furnace has the fires banked in it,—a coal fire,—and it is allowed to remain banked for some hours, and then the fires are raked out upon the grates. What is the character of sparks that would be driven through the flues and out of the smokestack?

"*A.* The sparks in such a case would be in the nature of coke, or very much the same as charcoal; a little heavier than charcoal sparks when the fire is first started. When the fire is first raked down, probably for 15 or 20 minutes, the sparks escaping from the stack, if there should any escape, would be in the nature of coke, light, much lighter than ordinary coal sparks.

"*Q.* Can you tell whether sparks of that character retain fire for any length of time?

"*A*.   They do.   In fact, so that I have known them sometimes to burn little spots on the deck of a boat where they came out of a stack and fell down.   They would blow away from the boat if there was a high wind, and they would retain their heat longer than a wood spark."

The only apparent object in referring to this testimony in the charge was to indicate to the jury that they might find from this that the fire was set by the tug Cuyler, and not by the Minnie M.   The testimony in reference to the tug shows that her fires were banked down, and, when she started out on that morning, the fire was raked down, some fresh coal put on, and that no sparks were going out of her stack while on the way down.   Several witnesses were called who testified positively that there were no sparks coming out of her stack.   The court was in error in this statement, as it was unwarranted by the testimony in the case.

Counsel for defendant do not attempt in their brief to answer any of the errors claimed by the plaintiff and here discussed, but content themselves with a discussion of the provisions of the statute under which the action is brought, which they claim is unconstitutional, and for that reason no action could be maintained upon it.

1. It is contended that the act contravenes section 20, art. 4, of the Constitution of this State, which provides: "No law shall embrace more than one object, which shall be expressed in its title."   It has been uniformly held in applying this provision of the Constitution that, if the title of the statute  expresses a general purpose, all matters fairly and reasonably connected with that purpose, and all measures which are convenient or appropriate or fairly calculated to facilitate the accomplishment of that purpose, are properly parts of the statute.   As was said in *Kurtz* v. *People*, 33 Mich. 282:

"It is a very wise and wholesome provision, intended to prevent legislators from being entrapped into the careless passage of bills on matters foreign to the ostensible

purpose of the statute as entitled. But it is not designed to require the body of the bill to be a mere repetition of the title. Neither is it intended to prevent including in the bill such means as are reasonably adapted to secure the object indicated by the title."

It is contended, however, that no person reading the title to this act would expect to find provisions for recovery of damages occasioned by neglect to provide fire screens for smokestacks. But the title to Act No. 206, Pub. Acts 1893, was no more specific. The title specified several specific and particular acts to be done, to wit, to assess property, to levy taxes, to collect the same, to make them a lien, to establish and continue such lien, to provide for the sale and conveyance of the lands, and to provide for the inspection and disposition of lands bid off to the State. By section 135 it is provided that no deed shall be recorded until a certificate is furnished showing the payment of all taxes; and further:

"A violation of the provisions of this section by any register of deeds shall be deemed a misdemeanor, and, upon conviction thereof, he shall be fined not to exceed one hundred dollars, and he shall further be liable to the grantee of any instrument so recorded for the amount of damages sustained, to be recovered in an action for debt in any court of this State."

This act was under consideration in *Van Husan* v. *Heames*, 96 Mich. 504, and the objection made that it contravened this provision of the Constitution. The act was upheld.

We think the act in the present case is not void upon the ground stated. The following cases also sustain this principle: *City of Grand Rapids* v. *Judge of Superior Court*, 93 Mich. 472; *Hall* v. *Judge of Superior Court*, 88 Mich. 438, at page 440; *People* v. *Hurlbut*, 24 Mich. 44, at page 57; *People* v. *Wands*, 23 Mich. 385, at page 389; *People* v. *State Ins. Co.*, 19 Mich. 392, at page 398; *People* v. *Mahaney*, 13 Mich. 481, at page 495.

But it is said that the object of the act is to compel

the use of fire screens by steam vessels, and to provide a penalty for the violation of that requirement, and that the term "penalty," as used in this title, excludes the idea of the imposition of damages to be paid to the party injured. The term "penalty," as used in the title, is intended to include the liability imposed for damages, as well as the liability for fine and imprisonment. As was said in *Grover* v. *Huckins,* 26 Mich. 476: "The term 'penalty' is used very loosely in statutes in some cases, and might without much strain of its ordinary meaning be held to embrace all the consequences visited by law upon the heads of those who violate police regulations." The term "penalty" is used as covering and including the imposition of damages in Act No. 313, Pub. Acts 1887, which was under consideration in *Robison* v. *Miner,* 68 Mich. 549, where, by section 20 of the act, it is provided that persons violating certain provisions of the act "shall, in addition to all other penalties provided for by this act, be liable for both actual and exemplary damages therefor," etc. See, also, *Hartford Fire Ins. Co.* v. *Raymond,* 70 Mich. 499, in which it said: "An act to regulate a business must of necessity visit some sort of punishment or penalty for violations of its provisions, as the penalty is the only lever that could give practical effect to the law."

2. The objection that the act is repugnant to the acts of Congress on the same subject has been fully discussed, and need not be further referred to; and the objection that fire screens endanger the vessel was disposed of in *Cheboygan Lumber Co.* v. *Delta Transportation Co., supra,* in which it was said:

"Of course, the first duty of a vessel owner is the protection of those on board and who are directly under his care. It follows that any device, appliance, or equipment which endangers them cannot be required by law, no matter how great the protection it would furnish to the property on shore. When the dangerous character of such devices is in issue, and the evidence is conflicting,

the jury should be very carefully and clearly instructed in the direction above indicated. They should be distinctly told that if they find the device, upon the use or absence of which negligence is based, is dangerous to the boat and to the property and persons on board, the law does not require its use."

The requirements of this statute are no more imperative than the common law, and may be enforced under the rule laid down in the foregoing case, unless it appears as a fact found in the case that the use of fire screens endangers the vessel, or the property or persons on board.

3. It is further contended that the act requiring a spark screen is unreasonable, and therefore void. The argument is that the requirement of the statute that the screens "shall be of the best approved kind, shown by experience to be proper and suitable for protection from fire," is unreasonable, because the question whether the kind employed upon the boat, in the endeavor to comply with the statute, was such a screen, must be determined by a jury, and the owner could not beforehand determine how the jury would decide upon that subject; also, if a definite screen were specified, other States might require different screens, and thus the vessel owner be put to inconvenience in complying with the different regulations.

Most of the cases referred to by counsel for defendant in support of this contention relate to city ordinances. Whether the ordinances of a city are valid or not involves the question of whether they are by the courts regarded as reasonable. This rule is applicable only to ordinances. 1 Dill. Mun. Corp. § 319. The courts cannot, however, declare a statute unconstitutional and void solely on the ground of unjust and oppressive provisions, or because it is supposed to violate the natural, social, or political rights of the citizen, unless it can be shown that such injustice is prohibited or such rights guaranteed or pro-

tected by the Constitution. Cooley, Const. Lim. (6th Ed.) p. 197. The learned author says further, at page 200:

"The rule of law upon this subject appears to be that, except where the Constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural justice or not in any particular case. The courts are not the guardians of the rights of the people of the State, except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise or oppressive legislation within constitutional bounds is by an appeal to the justice and patriotism of the representatives of the people."

This doctrine is upheld in numerous cases cited in the note to page 201.

The rule of the statute, however, is no more onerous than the rule of the common law, nor more difficult to comply with than are the requirements imposed by the courts to guard against danger arising to life and property by the operations of businesses which create such dangers. In *Hoyt* v. *Jeffers*, 30 Mich. 181, the suit was against the owner of a sawmill for failure to have a spark screen upon the smokestack or chimney of his mill. After referring to the fact that the mill stood in the midst of a city, and contiguous to wooden buildings, and that the degree of care required depended upon the surrounding circumstances, it was said:

"In fact, I think the true rule is that the defendant, in adopting means to check the flow of sparks and to avert the danger in question, under the circumstances of this case, was bound not only to adopt means calculated to avert the danger, but the means which, in the progress of science and improvement, has been shown by experience to be the best, unless, indeed, it be some invention so recently made as not to be generally known, or which the defendant, by reasonable inquiry for the best means, might not fairly be supposed to have obtained knowledge of."

In *Jackson* v. *Railway Co.*, 31 Iowa, 176, suit was brought for damages caused by fire set by a railroad

engine.  On the subject of the care required by the company to guard against fire, the court said:

"Ordinary care and prudence require the use of the best contrivances known, and, unless such are used, it will be considered negligence.  One who fails to use the best means within his reach to prevent the destruction of property does not exercise the care of a man of common prudence."

The same rule is laid down in *Metzgar* v. *Railway Co.*, 76 Iowa, 387; *Steinweg* v. *Railway Co.*, 43 N. Y. 126; *Spaulding* v. *Railway Co.*, 30 Wis. 121; *Toledo, etc., R. Co.* v. *Pindar*, 53 Ill. 447.  In some of the States statutes have been enacted imposing absolute liability for damages arising from fires set by locomotives, and such statutes have been upheld.  *Ross* v. *Railroad Co.*, 6 Allen, 87; *Martin* v. *Railroad Co.*, 62 Conn. 331; *Denver, etc., R. Co.* v. *De Graff*, 2 Colo. App. 42; *McCandless* v. *Railroad Co.*, 38 S. C. 103.  The legislature of this State, in the enactment of the statute under consideration, has imposed no greater burden upon vessel owners navigating the waters of this State than the common-law rule imposes in most of the States upon railroad companies in reference to means to prevent damage to life and property by fires.

4. The objection further made by counsel is that the title of the act provides that steam vessels shall provide fire screens, etc., while section 1 of the body of the act provides that all vessels using wood for fuel shall have fire screens, etc., and section 2 provides that the owner of any steam vessel neglecting to supply such screen shall be liable, etc., and that, therefore, the act is repugnant in its terms.  The rule of construction of statutes requires that a reasonable interpretation be given to the language used in the provisions so as to accomplish the object sought to be reached.  The aim and purpose of this statute is to compel steam vessels navigating the waters of this State to be provided with fire screens for smokestacks, and to provide a penalty for violation of this requirement.  The object is clear, and the mere omission

of the word "steam" before the word "vessels," in section 1 of the act, and the words "using wood for fuel" from section 2, does not render the act repugnant in its terms. Clearly, it means all steam vessels using wood for fuel.

For the errors pointed out, the judgment must be reversed, and a new trial ordered.

The other Justices concurred.