RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0081p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

TRUSTEES OF SHEET METAL WORKERS LOCAL 7 ZONE 1 PENSION FUND; TRUSTEES OF SHEET METAL WORKERS LOCAL 7 ZONE 1 HEALTH AND WELFARE FUND; TRUSTEES OF SHEET METAL WORKERS LOCAL 7 ZONE 1 FIVE CITIES ASSOCIATION JOINT APPRENTICESHIP AND TRAINING FUND,

> *Plaintiffs-Appellants*,

v.

PRO SERVICES, INC., a Michigan Corporation,

> *Defendant-Appellee*.

No. 22-1566

─────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:18-cv-01443—Jane M. Beckering, District Judge.

Argued: January 11, 2023

Decided and Filed: April 21, 2023

Before: BATCHELDER, STRANCH, and DAVIS, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Frank D. McAlpine, East Lansing, Michigan, for Appellants. Elizabeth A. Favaro, GIARMARCO, MULLINS & HORTON, P.C., Troy, Michigan, for Appellee. **ON BRIEF:** Frank D. McAlpine, East Lansing, Michigan, for Appellants. Elizabeth A. Favaro, GIARMARCO, MULLINS & HORTON, P.C., Troy, Michigan, for Appellee.

———————————————

**OPINION**

———————————————

JANE B. STRANCH, Circuit Judge.  The trustees of three multi-employer benefit funds ("the Funds")[1] sued Pro Services, Inc. under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*, and the Labor Management Relations Act (LMRA), 29 U.S.C. § 141 *et seq.*, to recover unpaid benefit contributions allegedly owed by Pro Services. The issue on appeal is whether a category of Pro Services' employees—known as Full-Service Maintenance Technicians ("FMTs")—performed work covered by the operative collective bargaining agreement (the "CBA" or "Agreement"), triggering Pro Services' payment obligation to the Funds for the hours worked by the FMTs.

The district court granted Pro Services' motion for summary judgment—it was undisputed that the FMTs worked in manufacturing, and the court concluded that the CBA covered workers in the construction industry based only on a caption in the CBA.  For the reasons stated below, we **REVERSE** the district court's grant of summary judgment, and remand the case for further proceedings.

**I. BACKGROUND**

This case was originally consolidated with a companion case brought against Pro Services by the trustees of fringe benefits funds for a millwrights' local union.  *See Michigan Reg'l Council of Carpenters Emp. Benefits Fund v. Pro Services, Inc.*, No. 1:18-cv-01300, 2020 WL 12718831 (W.D. Mich. Aug. 24, 2020) ("*Millwrights*").  In that companion case, the *Millwrights* court denied Pro Services' motion for summary judgment, determining that the dispositive issue was "whether and to what extent FMTs perform work within the work jurisdiction provision of the Millwright CBA."  *Id.* at *2.  The court first held that the Millwright CBA's work jurisdiction provision was unambiguous as to what work was covered and then

———————————————

[1]The Funds are: (1) the Sheet Metal Workers Local 7 Zone 1 Pension Fund; (2) Sheet Metal Workers Local 7 Zone 1 Health & Welfare Fund, and (3) the Sheet Metal Workers Local 7 Zone 1 – Five Cities Association Joint Apprenticeship and Training Fund.

concluded, based on FMT billing records and deposition testimony, that at least "some FMTs were performing covered work." *Id.* at *6-7. That was sufficient to defeat summary judgment, the court reasoned, because Pro Services was required to make contributions for all hours in which covered work was performed. *Id.* Since Pro Services failed to maintain adequate records, the court held that a trial was necessary to determine how many hours of covered work the FMTs performed. *Id.* Pro Services and the trustees then settled the case, and it was dismissed.

The present case also involves Pro Services, which is a Michigan-based industrial contractor that supplies skilled trade workers in the construction and manufacturing industries. It is a member of the Five Cities Association of Michigan, which is a chapter of the Sheet Metal and Air Conditioning Contractors' National Association ("SMACNA"), an employer-contractor association. The Funds were established to provide fringe benefits to sheet metal workers pursuant to the terms of the CBA, known as "the Agreement between the Five Cities Association of Michigan and Local Union No. 7-SM, Zone 1 International Association of Sheet Metal, Air, Rail and Transportation Workers." The CBA was negotiated by SMACNA and local union representatives of the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART" or "the Union").[2] Pro Services is a signatory to the Agreement. The Funds are third-party beneficiaries.

### A. Relevant Terms of the CBA

The language at the heart of this dispute appears after the cover page and index of the CBA, at the top of the first internal page:

STANDARD FORM OF UNION AGREEMENT
Form A-01-05
SHEET METAL, ROOFING, VENTILATING AND AIR
CONDITIONING CONTRACTING DIVISIONS OF THE
CONSTRUCTION INDUSTRY

---

[2]There are three versions of the CBA in the record, which have different effective dates but are otherwise identical. One covers the period from May 1, 2011, to April 30, 2013; one covers the period from May 1, 2013, to April 30, 2016; and one covers the period from May 1, 2016, to April 30, 2020. For ease of reference, we cite the CBA that was most recently in effect, R. 107-3.

The first substantive provision of the CBA, Article I, is the Trade Jurisdiction provision. It provides that "[t]his Agreement covers the rates of pay and conditions of employment of all employees of the Employer engaged in but not limited to" these listed work activities:

> (a) manufacture, fabrication, assembling, handling, erection, installation, dismantling, conditioning, adjustment, alteration, repairing and servicing of all ferrous or nonferrous metal work . . . and (g) all other work in the jurisdictional claims of International Association of Sheet Metal, Air, Rail and Transportation Workers.

The SMART Constitution specifies its work jurisdiction as including "any and all sheet metal work used in connection with . . . factories, warehouses, manufacturing plants and commercial buildings."

Also of note, Article III of the CBA provides that the "Employer agrees that none but journeymen, apprentice, preapprentice sheet metal workers shall be employed on any work described in Article I." In return, the "Union agrees to furnish . . . sheet metal workers in sufficient numbers as may be necessary to properly execute work contracted for by the Employer," pursuant to Article IV.

The CBA establishes the Funds—the Apprenticeship and Training Fund, the Health and Welfare Fund, and the Pension Fund—and incorporates their trust documents by reference. Signatory employers like Pro Services agree to contribute to the Funds "for all hours worked by sheet metal journeymen and apprentices," which they are required to hire, and the Union is required to furnish, for any of the work specified in the CBA's Trade Jurisdiction. Pro Services concedes that under the terms of the CBA and trust fund documents, it must contribute to the fringe benefit funds for work performed within the CBA's Trade Jurisdiction.

### B. Proceedings Below

In December 2018, the Funds sued Pro Services, seeking to recover unpaid contributions under ERISA. The Funds relied on audits conducted by a third-party firm to allege that nearly $8 million in contributions and damages arose from hours worked by 230 FMTs employed by Pro Services, from January 2013 through March 2019.

In October 2021, the Funds and Pro Services filed cross-motions for summary judgment. The Funds asserted that Pro Services was using non-union FMTs to perform work covered by the CBA's Trade Jurisdiction, in violation of the Agreement, and that Pro Services owed contributions for all hours of covered work. Based on language in the CBA caption, Pro Services argued that the CBA applies only to workers in the construction industry, and because FMTs worked solely in the manufacturing industry, no contributions were owed. Alternatively, Pro Services sought partial summary judgment as to the 195 FMTs the Funds did not depose, arguing that the audit was flawed because it did not consider the type of work the FMTs were performing, and instead assumed all hours worked were covered. The Funds responded that the standard form caption should not be read to limit the CBA's Trade Jurisdiction, and that no substantive provisions of the CBA contained such a limitation.

### C. Decision Below

The district court granted Pro Services' motion for summary judgment and denied the Funds' motion. Because the title of the parties' CBA "expressly identifies the 'Sheet Metal, Roofing, Ventilating and Air Conditioning Contracting Divisions of the Construction Industry,'" the court held that "the class of workers for whom fringe benefit contributions must be made" was limited to employees performing covered work in the construction industry, "and does not encompass employees performing covered work in other industries." R. 125, Opinion & Order, PageID 3457-58. The court emphasized that incidental sheet metal work by FMTs on factory floor equipment "does not convert their work to construction," and therefore the "CBA does not impose on Pro Services the payment obligation that the Funds allege[.]" *Id.*, PageID 3458.

The Funds sought reconsideration, which the court denied. This timely appeal followed.

## II. ANALYSIS

### A. Standard of Review

A grant of summary judgment is reviewed de novo and "if the evidence, taken in the light most favorable to the non-moving party, demonstrates that there are no genuine issues of material fact for trial," then "the moving party is entitled to judgment as a matter of law."

*Orrand v. Scassa Asphalt, Inc.*, 794 F.3d 556, 560 (6th Cir. 2015) (citing *Cent. States, Se. & Sw. Areas Pension Fund v. Gen. Materials, Inc.*, 535 F.3d 506, 508 (6th Cir. 2008)). "The district court's interpretation of the contractual agreements between the parties is also reviewed *de novo*." *Id.* at 560-61 (citing *Cent. States, Se. & Sw. Areas Pension Fund v. Behnke, Inc.*, 883 F.2d 454, 458 (6th Cir. 1989)).

## B. Governing Law Under ERISA and the LMRA

Although ERISA "is a complex statute," its "purpose is simple: to establish 'a uniform regulatory regime' for plan administration that protects monies belonging to plan beneficiaries while such funds are held and managed by others." *Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 434 (6th Cir. 2019) (quoting *Milby v. MCMC LLC*, 844 F.3d 605, 609 (6th Cir. 2016)). To help achieve this overarching purpose, ERISA requires "written agreements governing the creation and management of multi-employer fringe benefit funds." *Orrand*, 794 F.3d at 561; *see* 29 U.S.C. § 1102(a)(1). This writing requirement "lends certainty and predictability to employee benefit plans, serving the interests of both employers and their employees." *Orrand*, 794 F.3d at 561. Accordingly, employee benefit plans must "specify the basis on which payments are made to and from the plan." 29 U.S.C. § 1102(b)(4). ERISA further provides that "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall . . . make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145.

For benefit plans established through collective bargaining, Section 302 of the LMRA, 29 U.S.C. § 186(a), "bars an employer from contributing to benefit trusts designated by employee representatives unless the payments are 'made in accordance with a written agreement with the employer.'" *Orrand*, 794 F.3d at 561–62 (quoting *Behnke, Inc.*, 883 F.2d at 459). "Written agreements are required to prevent misappropriation or dissipation of monies that are owed to the employees." *Operating Eng'r's Loc. 324 Health Care Plan v. G & W Const. Co.*, 783 F.3d 1045, 1051 (6th Cir. 2015). Fund trustees, like the appellants here, are charged with collecting contributions and holding the monies in trust for the exclusive benefit of plan beneficiaries.

To interpret a CBA establishing an ERISA plan, the court employs "ordinary contract principles to the extent those principles are not inconsistent with federal labor policy." *Id.* at 1051 (citing *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015)). And when enforcing ERISA plans, the "principle that contractual provisions ordinarily should be enforced as written is especially appropriate." *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013). Thus, "[w]here the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *M & G Polymers*, 574 U.S. at 435 (quoting 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed. 2012)).

### C.  The Substantive Provisions of the CBA Govern

#### 1.  The Role of Titles

The first issue concerns the role titles play in determining the meaning of a contract. The parties agree that the relevant canon of construction is the title and headings canon, and that the seminal Supreme Court decision, *Brotherhood of Railroad Trainmen v. Baltimore & Ohio Railroad Co.*, 331 U.S. 519 (1947), governs.[3] *Trainmen* held that headings and titles "are of use only when they shed light on some ambiguous word or phrase," reasoning that as "tools available for the resolution of a doubt," they "cannot undo or limit that which the text makes plain." *Id.* at 529. In other words, "headings and titles are not meant to take the place of the detailed provisions of the text," and they "cannot limit the plain meaning of the text." *Id.* at 528-29. The Third Circuit has similarly held that the "title of a section cannot contradict or rewrite the plain language of the contractual provisions within that section. 'Contract headings do not constitute controlling evidence of a contract's substantive meaning.'" *In re G-I Holdings, Inc.*, 755 F.3d 195, 203 (3d Cir. 2014) (quoting *Fulkerson v. MHC Operating Ltd.*, 01C–07–020, 2002 WL 32067510, at *5 (Del. Super. Ct. Sept. 24, 2002)). Our cases employ the same analysis. *See*

---

[3]Pro Services suggests the Funds waived the argument that the title of the CBA conflicts with the text because they did not raise it until their motion for reconsideration. Not so: the Funds addressed this argument in their response to Pro Services' Motion for Summary Judgment. *See* R. 109, Funds' Response to Pro Services' Mot. for Summ. J., PageID 3157-65. It is, moreover, the district court's duty to apply the correct legal standards when resolving questions of law such as this. In any event, forfeiture would be excused under *Johnson v. Ford Motor Co.*, 13 F.4th 493, 504-05 (6th Cir. 2021), because this is purely a legal issue and Pro Services was provided and employed a full opportunity to respond below.

*Spurr v. Pope*, 936 F.3d 478, 488 (6th Cir. 2019) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 222 (2012) ("[A] title or heading should never be allowed to override the plain words of a text."); *see also Tonguette v. Sun Life & Health Ins. Co.*, 595 F. App'x 545, 547 (6th Cir. 2014) (noting that a heading "cannot be used to create ambiguity, but can be used to resolve it").

The district court did not apply these principles in its analysis. Instead, it found that the title "Sheet Metal, Roofing, Ventilating and Air Conditioning Contracting Divisions of the Construction Industry . . . *limits* the class of workers for whom fringe benefit contributions must be made." R. 125, PageID 3457 (emphasis added). It is true that the phrase "construction industry" had long been included in a caption in the form agreement. The title and headings canon governs, however, and looks first to the agreed-upon substantive terms within the Agreement.

Before considering a title, courts must first decide whether a substantive provision of the agreement is ambiguous. Only if a substantive provision is ambiguous may the court then consider the title or heading to resolve that ambiguity. *See United States v. Cain*, 583 F.3d 408, 416 (6th Cir. 2009) ("[C]onsidering the title is not appropriate unless the [provision] is ambiguous."); *Tonguette*, 595 F. App'x at 547 (considering an ERISA plan provision's heading only after finding that "[r]ead in isolation, the [] language appears ambiguous"). The decision below relied on *International Multifoods Corp. v. Commercial Union Insurance Co.*, 309 F.3d 76 (2d Cir. 2002), for the proposition that contracts must be "read as a whole, including any introductory clause or heading, to determine the intent of the parties." R. 125, PageID 3456 (quoting *id.* at 85). But in that case, the Second Circuit found that the substantive provision at issue in the contract was ambiguous. *Int'l Multifoods*, 309 F.3d at 85-86. And in *Tonguette*, we cited *International Multifoods* not to say that headings should be considered as part of the whole document, but instead to say that a provision's heading "cannot be used to create ambiguity," although it can be "used to resolve it." 595 F. App'x at 547 (citing *Int'l Multifoods*, 309 F.3d at 85). *International Multifoods* is compatible with our precedent and does not support consideration of a caption before deciding that a CBA's substantive provisions are ambiguous. The law is clear that titles and headings "cannot limit the plain meaning of the text."

*See Trainmen*, 331 U.S. at 528-29; *see also Cain*, 583 F.3d at 416. Only if a provision is ambiguous may the court consider the title or heading as part of the contract "as a whole," *see Int'l Multifoods*, 309 F.3d at 85, along with other relevant extrinsic evidence such as "known customs or usages in a particular industry," *M & G Polymers*, 574 U.S. at 439.

Pro Services then attempts to distinguish between "doubt" and "ambiguity," arguing that titles can be considered to resolve doubt, which it suggests may arise even in an unambiguous contract. But this misreads *Trainmen*, which held that titles are of use "only when they shed light on" an "ambiguous" provision. 331 U.S. at 529. Nor does *Tonguette* indicate that doubt and ambiguity are somehow different. *Tonguette* found the provision's language was ambiguous, saying nothing about whether it raised "doubt." 595 F. App'x at 547. Likewise, Pro Services' citation to *Burrows v. Delta Transportation Co.*, 64 N.W. 501 (Mich. 1895)—a Michigan Supreme Court case from 1895—is inapposite. That case did not talk about the title and headings canon, but involved the rule of construction that requires "a reasonable interpretation be given to the language used in the provisions so as to accomplish the object sought to be reached." *Id.* at 509. It contained no discussion of "doubt"—or ambiguity, for that matter. The governing law does not recognize a material distinction between doubt and ambiguity.

In light of the title and headings canon, elucidated in *Trainmen* and reaffirmed by this court in *Spurr* and *Tonguette*, the standard form caption could not be used to limit the application of the CBA's substantive terms, without the court first finding that those substantive provisions were ambiguous and employing a review of extrinsic evidence.

### 2. The CBA's Provisions

As explained in the companion *Millwrights* case, the underlying issue is whether the FMTs here were performing covered work, and our examination begins with whether the CBA is ambiguous as to which employees are covered. "Whether a contract term is ambiguous is a question of law for the court to determine." *Nw. Ohio Adm'rs, Inc. v. Walcher & Fox, Inc.*, 270 F.3d 1018, 1025 (6th Cir. 2001). "Where a contract's meaning is clear on its face, that meaning controls. Where a contractual provision 'is subject to two reasonable interpretations,' however,

that provision is deemed ambiguous, and the court may look to extrinsic evidence" to help construe it. *In re AmTrust Fin. Corp.*, 694 F.3d 741, 750 (6th Cir. 2012) (quoting *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1376 (6th Cir. 1994)). We have repeatedly held that "[t]rue linguistic ambiguities are 'rare in contract cases.'" *Watkins v. Honeywell Int'l Inc.*, 875 F.3d 321, 323-24 (6th Cir. 2017) (quoting *Stryker Corp. v. Nat. Union Fire Ins. Co.*, 842 F.3d 422, 426 (6th Cir. 2016)).

The CBA's Trade Jurisdiction provision provides that the Agreement "covers . . . all employees of the Employer engaged in but not limited to the: (a) manufacture, fabrication, assembling, handling, erection, installation, dismantling, conditioning, adjustment, alteration, repairing and servicing of all ferrous or nonferrous metal work . . .[,]" as well as "all other work included in the jurisdictional claims of the International Association of Sheet Metal, Air, Rail and Transportation Workers." The SMART Constitution's jurisdictional claims include "[a]ny and all sheet metal work used in connection with . . . factories, warehouses, manufacturing plants and commercial buildings."

The CBA's Trade Jurisdiction provision is unambiguous; its plain meaning is that the Agreement covers *all employees* of Pro Services engaged in the sheet metal work described, regardless of industry, and regardless of whether they work in "manufacture," "installation," or "repairing and servicing," to name a few examples. This makes sense because—as the Funds argue—the sheet metal trade is used in construction, manufacturing, mining, transportation, and many other industries. The language of Article I, which incorporates the SMART Constitution's jurisdictional claims, describes covered work activities in both the construction and manufacturing industries, rather than limiting coverage to just the construction industry.

Relying only on the dictionary, Pro Services argues that the use of the word "jobsite" in Article III implies that the CBA is limited to the construction industry because the plain and ordinary meaning of jobsite "is a location where construction work is performed." This argument is unavailing. Even if we assume that "jobsite" exclusively implicates construction work, this CBA employs a number of other terms. For example, the Trade Jurisdiction provision states that the Agreement covers the "operating of all automated or computer controlled

fabricating equipment *in the shop*." And Article VIII provides for the "minimum rate of wages for journeymen sheet metal workers covered by this Agreement when employed *in a shop or on a job*."

It is commonplace for a trade jurisdiction provision to define and determine a CBA's coverage, regardless of whether employees are members of a particular industry, or even members of the union. For example, we have explained that "contributions were contractually required for all employees—not only for Union employees" where the employees covered by trust agreements were "defined by the nature of their work and not their union status." *Trs. of B.A.C. Loc. 32 Ins. Fund v. Fantin Enters., Inc.*, 163 F.3d 965, 970 (6th Cir. 1998) (quoting *Pipefitters Welfare Fund, Local 597 v. Stangard Refrigeration Serv., Inc*., No. 83 C 6374, 1984 U.S. Dist. LEXIS 15244, at *6 (N.D. Ill. 1984)); *see also Bds. of Trs. of Ohio Laborers' Fringe Ben. Programs v. Jenkins*, 283 F. App'x 315, 318 (6th Cir. 2008).

Here, the CBA is unambiguous as to what work is covered. As in the companion *Millwrights* case, the question becomes whether Pro Services' FMTs were performing covered work, because the Funds are entitled to recover unpaid benefits contributions for the hours that covered work was performed. In their briefing below, the Funds cited deposition testimony from some FMTs who said they performed sheet metal work on a regular basis. As the *Millwrights* court explained, "[t]he existence of *some* covered work is sufficient to defeat Pro Services' motion for summary judgment." 2020 WL 12718831, at *7. Because there is a genuine dispute of material fact as to how much covered work the FMTs performed, summary judgment is inappropriate. As the *Millwrights* court noted, however, the district court need not "simply accept the audit at face value and use that to determine what payments remain unpaid . . . because it is based on the fundamentally flawed premise that *every* hour worked by *every* FMT was covered work." *Id.* On remand, the central question identified by the court in the *Millwrights* case is necessarily raised: were the FMTs performing work covered by the CBA's Trade Jurisdiction provision, and if so, how much?

### III.  CONCLUSION

For the foregoing reasons, we **REVERSE** the grant of summary judgment, and remand the case for further proceedings consistent with this opinion.