PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 13-3335 and 13-3336
_____

IN RE:  G-I HOLDINGS, INC.,
formerly known as GAF Corporation,

Debtor


UNITED STATES GYPSUM COMPANY,

Appellant No. 13-3335

QUIGLEY COMPANY, INC.,

Appellant No. 13-3336
_____

On Appeal from United States District Court
for the District of New Jersey
(D. N.J. No. 2-12-cv-6933)
District Judge:  Dennis M. Cavanaugh
_____

Argued April 8, 2014

Before:  FISHER and SCIRICA, *Circuit Judges*, and
MARIANI,[*] *District Judge*.

(Filed:  June 17, 2014)

Rachel S. Bloomekatz, Esq.  **ARGUED**
Jones Day
Suite 600
325 John H. McConnell Boulevard
Suite 600, P.O. Box 165017
Columbus, OH 43215

Brad B. Erens, Esq.
Brian J. Murray, Esq.
Jones Day
77 West Wacker Drive
Suite 3500
Chicago, IL 60601

*Counsel for Appellant United States Gypsum Co.*

John P. DiIorio, Esq.
Shapiro Croland
411 Hackensack Avenue
Hackensack, NJ 07601

---

[*]The Honorable Robert D. Mariani, District Judge for
the United States District Court for the Middle District of
Pennsylvania, sitting by designation.

Stephen D. Hoffman, I, Esq.  **ARGUED**
Wilk Auslander
1515 Broadway
43rd Floor
New York, NY 10036
*Counsel for Appellant Quigley Co. Inc.*

Mark E. Hall, Esq.
Dennis J. O'Grady, Esq.
Riker, Danzig, Scherer, Hyland & Perretti
One Speedwell Avenue
Headquarters Plaza
Morristown, NJ 07962-0000

Andrew J. Rossman, Esq.  **ARGUED**
Scott C. Shelley, Esq.
Jacob J. Waldman, Esq.
Quinn, Emanuel, Urquhart & Sullivan
51 Madison Avenue
22nd Floor
New York, NY 10010
*Counsel for Appellees*

_____

OPINION OF THE COURT
_____

3

FISHER, *Circuit Judge*.

Due to the rising number of asbestos-related personal injury lawsuits filed in the 1980s, a group of producers of asbestos and asbestos-containing products ("Members" or "Participating Producers") joined together and formed the Center for Claims Resolution (the "Center") to administer asbestos personal injury claims on behalf of the Members. The Members negotiated and signed the Producer Agreement Concerning Center for Claims Resolution (the "Producer Agreement"), which established and set forth the mechanics of the Center and the obligations of the Members. Appellants United States Gypsum Company ("U.S. Gypsum") and Quigley Company, Inc. ("Quigley") and the predecessor-in-interest of Appellee G-I Holdings, Inc. ("G-I") were among the roughly twenty asbestos producers who signed the Producer Agreement, thereby becoming Members of the Center.

After G-I failed to pay its contractually-calculated share due to pay out personal injury settlements and cover Center expenses, U.S. Gypsum and Quigley were obligated to pay additional sums to cover G-I's payment obligations. G-I filed for bankruptcy and the Center, U.S. Gypsum, and Quigley each filed a proof of claim in the Bankruptcy Court seeking to recover for G-I's nonpayment under the Producer Agreement. The Center eventually settled its claim with G-I.

Although arising in the context of a bankruptcy proceeding, this case concerns claims for breach of contract under Delaware law. We are asked to decide whether, under the Producer Agreement, U.S. Gypsum and Quigley (together, the "Former Members") may maintain a breach of contract action against G-I. We hold that the Producer Agreement permits the Former Members to pursue a breach of contract action against G-I for its failure to pay

4

contractually-obligated sums due to the Center, in light of the Former Members' payment of G-I's share. We therefore vacate the District Court's order affirming the Bankruptcy Court's grant of summary judgment in G-I's favor.

I.

A.

Facing a growing number of asbestos-related personal injury lawsuits, a group of producers of asbestos and asbestos-containing products joined together to form the Center in order to more effectively defend against and resolve the lawsuits. The Center was incorporated as a non-profit, non-stock Delaware corporation in September 1988 to "administer and arrange for the evaluation, settlement, payment, and defense of asbestos-related bodily injury claims." (A-684).

The Producer Agreement sets forth the Members' purposes in entering the agreement and establishing the Center. The Members stated that they "believe it is important to establish an organization that will, on behalf of all Participating Producers, resolve meritorious asbestos-related claims in a fair and expeditious manner and, where necessary, defend asbestos-related claims efficiently and economically." (A-715). They also sought to "enter into a constructive relationship with one another and to resolve any cross or counter claims that they may have against each other." (*Id.*).

The Center was governed by a five-person Board of Directors. A producer became a Member of the Center by signing the Producer Agreement, and membership could be terminated by a Member's written notice, by a Member's bankruptcy, or by resolution of the Board of Directors. However, even after termination of membership, the former Member would "continue to have and to honor all of the obligations incurred by it [under the Producer Agreement] or

5

on its behalf as a member prior to the effective date of its membership termination." (A-720).

The Producer Agreement designates the Center as each Member's "sole agent to administer and arrange on its behalf for the evaluation, settlement, payment or defense of all asbestos-related claims against such Participating Producer." (A-721). The Producer Agreement defines "asbestos-related claims" as "claims or lawsuits against any Participating Producers or the Center . . . seeking monetary relief . . . for bodily injury, sickness, disease or death, alleged to have been caused in whole or in part by any asbestos or asbestos-containing product." (A-716). After settling or otherwise resolving claims on behalf of the Members, the Center would bill and collect each Member's allocated share of liability payments and expenses based upon a formula set forth in an attachment to the Producer Agreement.

If a Member failed to pay its share of liability payments or expenses in a timely manner, the Producer Agreement provides that "the Center's Board of Directors may direct the Center to institute an ADR on behalf of the Center's Participating Producers against such Participating Producer to enforce payment of such obligations." (A-731-32). With respect to claims between Members, the Producer Agreement provides that "[s]o long as it is a member of the Center each Participating Producer shall forego with respect to asbestos-related claims for contribution or indemnity (other than for contribution or indemnity assumed under written agreement) against all other Participating Producers that are members of the Center." (A-730-31).

Finally, the Producer Agreement sets forth that it is "not intended to confer any rights or benefits upon any other persons" aside from Members, the Center, and some of the

6

Members' insurers. (A-727). Other than the Center, a signatory Member, or a Member's insurer, "[n]o person . . . shall have any legally enforceable rights under the Agreement." (*Id.*). "All rights of action for any breach of this Agreement by any signatory hereto are hereby reserved to the Center, Participating Producers and to Supporting Insurers that are paying unallocated expenses incurred by the Center." (*Id.*).

G-I is the successor-in-interest to GAF Corporation, which was named in a large number of asbestos-related lawsuits. G-I's membership in the Center was terminated by the Center's Board of Directors after the Board determined that G-I had breached the Producer Agreement by failing to pay its share of settlements and expenses. G-I's termination was effective January 17, 2000. Shortly after the termination of G-I's membership, the Center notified G-I that it owed the Center almost $300 million and commenced an ADR for payment. The ADR was stayed once G-I filed for bankruptcy in January of 2001. The Center sought additional payments from the remaining Members to satisfy G-I's share of settlements and expenses.

U.S. Gypsum and Quigley were Members of the Center at the same time as G-I. On February 1, 2001, Quigley withdrew from the Center, thereby terminating its membership. On June 25, 2001, U.S. Gypsum filed for Chapter 11 bankruptcy, which terminated its membership. U.S. Gypsum and Quigley assert that they made payments to the Center to cover the shortfall caused by G-I's failure to pay.

B.

G-I filed for Chapter 11 bankruptcy on January 5, 2001. The Bankruptcy Court fixed October 15, 2008 as the date by which all proofs of claim against any interest in the

7

debtor had to be filed. On October 9, 2008, the Center filed a proof of claim alleging that G-I was liable to the Center for a total of $254.7 million due to its breach of the Producer Agreement.[1] The Center alleged that it paid out $29.5 million to asbestos claimants on G-I's behalf before it stopped paying out G-I's share of the settlements to asbestos claimants. It also asserted that G-I owed it $2.6 million for G-I's share of the Center's expenses. Finally, the Center claimed damages for settlement agreements that asbestos claimants had voided after G-I's membership terminated. Although the Center had not paid out any of these settlements, it claimed that G-I owed it $222.6 million as damages for the settlements that would not have been voided but for G-I's breach. In its proof of claim, the Center did not state whether it had sought reimbursement from the remaining Members of the Center for the $29.5 million it paid on G-I's behalf.

Both of the Former Members filed a separate proof of claim seeking to recover sums paid to the Center to cover G-

---

[1] The amount of the Center's claim as of the date of G-I's bankruptcy filing differs from the amount of the claim as of the date of filing the proof of claim. *See* A-775 ("As of January 6, 2001 (the "Petition Date"), the [Center] had a claim against G-I Holdings, Inc. (the "Debtor") in the aggregate principal amount of $299,510,764 plus interest and attorneys' fees. As of the date of the filing of this Proof of Claim, the [Center] has a claim against the Debtor in the aggregate principal amount of $254,705,373 plus interest, fees, and expenses."). The Center had sought the $299.5 million figure from G-I shortly after its membership terminated. We use the $254.7 million figure because that is the amount stated as presently owed in the proof of claim that G-I and the Center eventually settled.

I's obligations. U.S. Gypsum filed its proof of claim on October 15, 2008, asserting a breach of contract claim. U.S. Gypsum maintained that in November 2000, the Center sought reimbursement from the remaining Members of the Center, including U.S. Gypsum, for the Center's payment of $30 million to asbestos claimants on G-I's behalf. U.S. Gypsum paid roughly $6.3 million to the Center to reimburse the Center for the payments made on G-I's behalf. Quigley filed a proof of claim on October 13, 2008 seeking unliquidated damages for G-I's breach of the Producer Agreement. G-I filed objections to the proofs of claim.

The Center and G-I settled the Center's claim against G-I seeking $254.7 million for a cash payment of $9.9 million. On September 4, 2009, G-I moved for approval of the Settlement Agreement in the Bankruptcy Court. The Former Members objected to the settlement and sought clarification that the Settlement Agreement would not affect or release their claims against G-I. The Bankruptcy Court added language to the Order approving the Settlement Agreement, which was entered on September 24, 2009, providing that the Settlement Agreement was "binding on all entities asserting claims against G-I that derive from [the Center] or depend upon [the Center's] rights." (A-476). However, "[f]or the avoidance of doubt, nothing in this Order or the [] Settlement Agreement shall release, prejudice, compromise or otherwise affect the claims, if any, that Former Members . . . have or may have against the G-I Plan Parties . . . ." (*Id.*).

The District Court and Bankruptcy Court approved G-I's Eighth Amended Joint Plan of Reorganization on November 12, 2009. In the Eighth Amended Plan, G-I maintained that the Former Members' claims were derivative of the Center's settled claim, and should therefore be

9

considered settled. But the Plan set forth that to the extent that the Former Members' claims would be allowed, they would receive cash equal to 8.6% of the allowed claim amount.

G-I filed for summary judgment on the Former Members' claims on July 15, 2010. After briefing, the Bankruptcy Court issued an opinion on August 13, 2012 granting the motion for summary judgment in G-I's favor. The Bankruptcy Court concluded that the Center was authorized to resolve G-I's breach by nonpayment, and the Producer Agreement barred the Former Members from pursuing claims, including for breach of contract, against G-I. The Bankruptcy Court also determined that the Former Members' claims were derivative of the Center's claim, which provided an additional reason that Former Members could not maintain their claims against G-I.

U.S. Gypsum and Quigley appealed to the District Court, which affirmed the Bankruptcy Court's decision on June 26, 2013. The District Court agreed with the Bankruptcy Court that the Former Members were contractually barred from pursuing an independent breach of contract action against G-I, reasoning that the Producer Agreement sought to avoid all litigation between Members. The District Court explained that, when read in the context of Section X's title ("Third-Party Rights") and the rest of the Producer Agreement, language reserving rights of action for breach to the Members did not create a right to bring breach of contract claims. It also concluded that the section permitting the Center to bring an ADR for a Member's failure to pay did not "leav[e] open the option for independent members to bypass the sole authority of the [Center] to remedy [the breach] on their own." (A-7). The District Court did not reach the issue of whether the Former Members'

10

claims were direct or derivative. U.S. Gypsum and Quigley both filed a timely notice of appeal.

## II.

The Bankruptcy Court had jurisdiction over this core matter in G-I's bankruptcy proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157. The Former Members timely appealed the Bankruptcy Court's final order to the District Court, which exercised its jurisdiction under 28 U.S.C. § 158(a)(1) and Bankruptcy Rule 8001(a). We have jurisdiction to review the District Court's final order under 28 U.S.C. § 158(d)(1) and 28 U.S.C. § 1291.

"We review a district court's grant of summary judgment *de novo*, applying the same standard the district court applied." *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011). "We also review the legal interpretation of contractual language *de novo*." *Id.*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In conducting our review, we view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 535 (3d Cir. 2007). A motion for summary judgment is properly denied if "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252.

## III.

The Former Members argue that the District Court erred in holding that the Producer Agreement bars them from pursuing a breach of contract claim against G-I. They also urge us not to adopt the Bankruptcy Court's conclusions that the Former Members' claims are derivative of the Center's claim and that allowing Former Members' claims would lead to a double recovery. We will address each issue in turn.

A.

In determining whether the Former Members may maintain a breach of contract action against G-I under the Producer Agreement, we must heed the guidance of the Delaware courts[2] and "give priority to the parties' intentions as reflected in the four corners of the agreement." *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012). "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). A court should interpret the contract "in such a way as to not render any of its provisions illusory or meaningless." *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992). "[C]lear and unambiguous terms" in a contract are interpreted according to their ordinary meaning. *GMG Capital Invs.*, 36 A.3d at 780. However, "the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *E.I. du Pont de Nemours*, 498 A.2d at 1113.

---

[2] The parties agree that the law of the state of Delaware governs the Producer Agreement.

We also must keep in mind the elements that a plaintiff must prove for breach of contract. For a successful breach of contract claim, a party must prove: "1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

With these principles in mind, we turn to the terms of the Producer Agreement. We will first address the language that is most relevant to Former Members' ability to sue G-I for its breach by nonpayment, which is found in Section X. We will then address whether allowing Former Members to bring a breach of contract action under Section X is consistent with the purpose of the Producer Agreement and with its other provisions and overall scheme.

The third sentence of Section X provides: "All rights of action for any breach of this Agreement by any signatory hereto are hereby reserved to the Center, Participating Producers and to Supporting Insurers . . . ." (A-727). G-I and Former Members were signatories to the Agreement and Participating Producers at the time of G-I's alleged breach. For the purposes of this appeal, we will assume that G-I did breach the Producer Agreement by failing to make required payments.[3] If this case involved only G-I's nonpayment of its

---

[3] The District Court ruled on summary judgment that the Agreement barred Former Members from bringing a breach of contract action against G-I as a matter of law. It did not reach the merits of the breach of contract claim – i.e. whether G-I failed to make required payments and thereby breached the Producer Agreement. G-I disputes the breach; however, as Former Members are the non-moving parties, we will construe the facts in their favor and assume G-I's breach through nonpayment.

13

obligations to the Center, the Former Members would be unable to maintain a breach of contract action against G-I because they would not yet have suffered damages. But once the Former Members were required to make additional payments to cover the shortfall caused by G-I's nonpayment, they suffered damages and accrued a cause of action for breach of contract. Section X reserves the right of the Former Members – Participating Producers at the time of G-I's breach – to maintain an action for breach of the Producer Agreement against G-I – a signatory.

Section X makes explicit a basic contract law principle. "It is axiomatic that either party to an agreement may enforce its terms for breach thereof." *Triple C Railcar Serv., Inc. v. City of Wilmington*, 630 A.2d 629, 633 (Del. 1993) (citing Richard A. Lord, *Williston on Contracts*, § 1:1 (4th ed. 1990)). Section X expands the universe of entities that may bring a breach of contract action under the Producer Agreement beyond the Members (who were the only signatories to the Producer Agreement) to include the Center and some of the Members' insurers. It was not necessary for the Producer Agreement to acknowledge the Members' ability to sue for breach because such an ability is inherent in contract law. But because the Producer Agreement does clearly provide for such a suit, we should not lightly overlook Section X as it is the most relevant provision to the issue at hand.

G-I argues – and both the Bankruptcy and District Courts agreed – that this language merely limits third party rights under the Producer Agreement. Section X is titled "Third-Party Rights." But we will not discount the plain language of the third sentence of that section merely because of the title. A court "may examine the [contract] heading 'as additional evidence tending to *support* the contract's

14

substantive provisions.'" *Fulkerson v. MHC Operating Ltd.*, 01C-07-020, 2002 WL 32067510, at \*5 (Del Super. Ct. Sept. 24, 2002) (emphasis added) (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 582 n.35 (Del. Ch. 1998)). The title of a section cannot contradict or rewrite the plain language of the contractual provisions within that section. "Contract headings do not constitute controlling evidence of a contract's substantive meaning." *Id.*

G-I also relies upon the other provisions in Section X to write off the third sentence. The first two sentences of Section X make it clear that the Producer Agreement does not confer rights or benefits upon third parties, and that the only entities with legally enforceable rights under the Agreement are the Center, signatories to the Producer Agreement, and certain insurers. G-I would read the third sentence to merely reiterate what the first two already make express – that unnamed parties are prevented from enforcing the contract. [4] But this reading would drain the third sentence of meaning and would "render a provision or term" – i.e., the language reserving rights of action for breach of contract – "meaningless or illusory." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal quotation marks

---

[4] G-I also takes a different tack by arguing that even if the third sentence can be read as allowing Participating Producers to bring breach of contract actions, it need not be read to allow actions for nonpayment, and instead should be read as reserving the right to remedy breaches *other* than for nonpayment. But this runs counter to the plain language of the provision, which specifically reserves "all" rights to bring actions for "any" breach of the Agreement. (A-727). These words imply that actions for breach due to nonpayment are included.

omitted). This would violate the rule of contract interpretation that we must "give each provision and term effect, so as not to render any part of the contract mere surplusage." *Id.* (internal quotation marks omitted) (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010)). We therefore decline G-I's invitation to read the third sentence of Section X as a reiteration of or further clarification on the preclusion of third party rights under the Producer Agreement. Unless the language of Section X regarding breach of contract actions is irreconcilably inconsistent with the Producer Agreement's purpose, other provisions, or overall contractual scheme, we should give effect to the "clear and unambiguous" language reserving the Former Members' right to bring a breach of contract action against G-I. *GMG Capital Invs.*, 36 A.3d at 780.

We believe that the plain language of Section X is perfectly consistent with the overall purpose of the Producer Agreement. We consider the purpose of the Producer Agreement because we must "give priority to the parties' intentions," *id.* at 779, and because we do not allow the meaning of a particular provision in an agreement to control the meaning of the agreement as a whole where that meaning "runs counter to the agreement's overall scheme or plan." *E.I. du Pont de Nemours*, 498 A.2d at 1113.

The introductory statements to the Producer Agreement set forth its purposes. One statement provides that the Members "desire to enter into a constructive relationship with one another and to resolve any cross or counter claims that they may have against each other." (A-715). The courts below relied in part upon this statement in concluding that the purpose of the Producer Agreement was to prevent "internecine" litigation – i.e. *all* litigation

16

occurring between Members. (A-5, A-51). This goes too far and assumes intent to avoid a lawsuit such as this one where no such intent was expressed. The Producer Agreement states that the Members sought to resolve cross and counterclaims that they might have against one another. Cross and counterclaims refer to claims that Members could have against one another in the thousands of asbestos-related personal injury lawsuits that were the main concern of the Producer Agreement. The words crossclaim and counterclaim presume the existence of an *underlying* claim already being litigated. *See Black's Law Dict.* 433 (9th ed. 2009) (defining crossclaim as "[a] claim asserted between codefendants or coplaintiffs in a case and that relates to the subject of the original claim or counterclaim"); *Black's Law Dict.* 402 (9th ed. 2009) (defining counterclaim as "[a] claim for relief asserted against an opposing party after an original claim has been made"). If the Members sought to avoid *all* litigation – as the courts below concluded – they could have drafted the Producer Agreement to provide that they sought to resolve *any claims* that they might have against each other, instead of *any cross or counterclaims.* "[C]ourts should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it." *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1035 (Del. Ch. 2006).

Unlike the courts below, we cannot say that allowing Former Members to pursue a breach of contract action against G-I for its nonpayment is inconsistent with the overall purpose of the Producer Agreement. The Producer Agreement sought to avoid litigation over the allocation of liability in the thousands of asbestos-related personal injury suits that inspired the creation of the Center in the first place. The desire to resolve these cross and counterclaims says

17

nothing about the type of claim here – a claim among Members for breach of contract, unrelated to any individual asbestos-related claim. The expansive reading of purpose endorsed by the courts below – preventing internecine litigation – colored their analysis of the entire Producer Agreement, leading them to conclude that the Former Members' suit against G-I was barred. We will not adopt such a broad interpretation and instead conclude that the Former Members' right to bring a breach of contract action is consistent with the purpose of the Producer Agreement.

We turn now to consider whether allowing the Former Members to sue G-I for its breach under Section X is consistent with the other provisions of the Producer Agreement. "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours*, 498 A.2d at 1113. If a meaning that arises from one portion of the agreement conflicts with the agreement's "overall scheme or plan," it cannot control. *Id.* In interpreting the entire agreement, "[s]pecific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one." *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005). Section X is a general provision, broadly setting forth the right to bring a breach of contract action. If this provision conflicts with a more specific provision elsewhere in the Producer Agreement or with its overall scheme or plan, we should not allow Section X to control.

We turn first to Section IV's designation of the Center as the Members' "sole agent." By signing the agreement, "each Participating Producer hereby designates the Center as its sole agent to administer and arrange on its behalf for the

18

evaluation, settlement, payment or defense of all asbestos-related claims against such Participating Producer." (A-720-21). This provision does not conflict with Former Members' ability to bring a breach of contract claim against G-I, because the Center's role as "sole agent" applies only to "asbestos-related claims." "Asbestos-related claims" are specifically defined in the Producer Agreement as lawsuits against Participating Producers or the Center "seeking monetary relief . . . for bodily injury, sickness, disease or death, alleged to have been caused in whole or in part by any asbestos or asbestos-containing product." (A-716). The Former Members' claims are breach of contract claims made by one party to an agreement against another party seeking remuneration for the breaching party's failure to pay its contractually-allocated share of payments to settle asbestos-related claims. Their claims are not themselves "asbestos-related claims." Allowing the Former Members to sue G-I for its nonpayment does not interfere with the Center's role as "sole agent" for the purposes of administering and settling these asbestos personal injury claims.

Next we turn to the first paragraph of Section XIV ("Section XIV.1"), which provides that during its membership, "each Participating Producer shall forego with respect to asbestos-related claims for contribution or indemnity (other than for contribution or indemnity assumed under written agreement) against all other Participating Producers that are members of the Center." (A-730-31). Like the "sole agent" provision in Section IV discussed above, because Section XIV.1 qualifies its application to "asbestos-related claims" only, it does not conflict with Section X. In limiting suits for contribution and indemnity in asbestos personal injury lawsuits, this provision implements the Producer Agreement's stated purpose of resolving cross

19

and counterclaims among the Members. Asbestos-related claims for contribution or indemnity seek to reapportion damages based upon each tortfeasor's proportionate share of liability in the underlying personal injury lawsuits. *See e.g.*, *Black's Law Dict.* 378 (9th ed. 2009) (defining contribution as "[o]ne tortfeasor's right to collect from joint tortfeasors when – and to the extent that – the tortfeasor has paid more than his or her proportionate share to the injured party, the shares being determined as percentages of causal fault"). The Former Members' breach of contract actions seek to recover a set amount of money that they paid to cover G-I's obligation as calculated under a contractual formula. These claims are not based upon G-I's share of the "fault" in the asbestos personal injury actions; rather, they are based upon the Producer Agreement. We cannot read Section XIV.1, which limits suits for contribution and indemnity for asbestos-related claims, as being in conflict with the Former Members' ability to bring suit for breach of the Producer Agreement under Section X.

Finally, we turn to the fourth paragraph of Section XIV ("Section XIV.4"), which addresses a Member's nonpayment. This section provides: "In the event that any Participating Producer's percentage shares of liability payments or allocated expenses are not paid in a timely manner, the Center's Board of Directors may direct the Center to institute an ADR on behalf of the Center's Participating Producers against such Participating Producer to enforce payment of such obligations." (A-731-32). Allowing Former Members to maintain their breach of contract actions against G-I does not conflict with this provision for several reasons. Most notably, Section XIV.4 provides that in the event of nonpayment, the Center's Board *may* direct the Center to institute an ADR. This language is permissive, not

mandatory or exclusive. Language in Section IV clearly articulates the Center's "exclusive authority" and role as the Members' "sole agent" in administering asbestos-related claims brought against Members. The drafting parties therefore knew how to draft a provision giving the Center "sole" or "exclusive" authority. In concluding that the Center had the exclusive right to bring an action for G-I's nonpayment, the courts below changed "may" into "exclusively has the authority to." We will not read "exclusive authority" into the contract "when the contract could easily have been drafted to expressly provide for it." *Allied Capital Corp.*, 910 A.2d at 1035.

Consideration of the third element of a breach of contract claim – damages – is the key to understanding why the Former Members' right to pursue a breach of contract action is consistent with Section XIV.4. The Former Members suffered damages once they were required to make additional payments to cover the shortfall caused by G-I's breach. Before the Former Members were required to cover the shortfall, the harm G-I caused fell upon the Center, as the Center was unable to collect payments and therefore fulfill its settlement obligations to asbestos plaintiffs. In such a situation, the Center would rely upon Section XIV.4 to enforce the nonpaying Member's obligations. But once the other Members paid G-I's share, the harm to the Center was remedied – the Center fulfilled its obligations to asbestos plaintiffs – and became a harm to the Members who paid more than their share due under the Producer Agreement. Sections X and XIV.4 are particularly consistent with one another when viewed in light of the timing considerations outlined above. Section XIV.4 allows the Center to "enforce payment" *before* the Center has required others to cover the breaching signatory's share, when the Center is responsible

21

for the money due to asbestos plaintiffs. Section X allows Members to bring a breach of contract action *after* the Center has required them to cover and pay the breaching signatory's share, when the Center has fulfilled its obligations to asbestos plaintiffs and the damage caused by the breach has shifted onto those Members.[5]

---

[5] If the Center were to bring and carry through to judgment an ADR on behalf of *all* Members harmed by one Member's breach, it is possible that Section XIV.4 would foreclose those Members' ability to sue under Section X even if the non-breaching Members had covered and paid the breaching Member's share. Under these circumstances, the Center would have recovered on behalf of *all* Members who covered and paid, and their right to recovery would be foreclosed as their injury would have been remedied by the Center, acting on their behalf. Since the Center would have obtained this recovery, perhaps adjustments would be made to these Members' future obligations to the Center.

But that is not what happened here. While the Center did institute an ADR in 2000, that ADR was stayed after G-I declared bankruptcy. Ultimately, the Center resolved its own claims and claims on behalf of *present* members of the Center in 2009 through a settlement approved by the Bankruptcy Court. As further discussed below, this settlement did not include Former Members' claims – it explicitly stated that the settlement covered only the Center's claims and the claims of eight listed "Members," not including U.S. Gypsum or Quigley. Therefore, the Center's ADR right under Section XIV.4 and the Former Members' right to bring a breach of contract action under Section X do not conflict under the events that have transpired here.

We therefore conclude that the Former Members' right to bring a breach of contract action for G-I's nonpayment under Section X does not conflict with "the agreement's overall scheme or plan." *E.I. du Pont de Nemours*, 498 A.2d at 1113. Indeed, reading the Producer Agreement to allow such an action when one Member pays another Member's share is the only way to give all of its provisions meaning. The way that the courts below read the Producer Agreement renders meaningless the third sentence in Section X, writes out the qualifying phrase "with respect to asbestos-related claims" in Section XIV.1, and turns "may" into "exclusively has the authority to" in Section XIV.4. We eschew their reading in favor of one that "gives effect to every term of the instrument." *Council of Dorset Condo. Apartments v. Gordon*, 801 A.2d 1, 7 (Del. 2002). We will therefore vacate the District Court's order affirming the Bankruptcy Court's order granting summary judgment to G-I, as the Producer Agreement allows Former Members to pursue a breach of contract action against G-I.

B.

We will briefly address the argument that the Former Members cannot pursue their breach of contract action against G-I because their claims are not direct claims, but are instead derivative of the Center's claim. The District Court did not reach this argument, but the Bankruptcy Court did, holding in the alternative that even if the Producer Agreement did not prevent the Former Members' claims, they were barred due to their derivative nature.

Generally, if a cause of action belongs to a corporation, only the corporation may bring that action. Under some circumstances, a shareholder may bring a "derivative" claim on behalf of a corporation for harm done to the corporation with recovery going to the corporation.

23

*Tooley v. Donaldson, Lufkin & Jenrette*, 845 A.2d 1031, 1036 (Del. 2004). When a shareholder is injured in a way that affects his or her legal rights as a shareholder, however, the shareholder retains the right to bring a "direct" claim, with recovery going directly to shareholders. *Id.* The Supreme Court of Delaware has set forth a standard – the *Tooley* standard – to use in determining whether a shareholder's claim is direct or derivative. The inquiry "turn[s] *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Id.* at 1033.

We can see no reason why the direct/derivative inquiry should apply in this situation. Under the case law, the distinction applies to claims brought by shareholders in a corporation. *See id.* ("We set forth in this Opinion the law to be applied henceforth in determining whether a stockholder's claim is derivative or direct."). G-I and the Former Members were not shareholders or investors in the Center, which, as a non-profit, non-stock corporation, has no shareholders. G-I has not brought to light any cases bearing any similarity to the situation here. Cases applying the distinction elsewhere in corporate and partnership law – such as to limited partnerships and LLCs – are inapplicable, as the Center's structure and relationship with its Members is not similar to those corporate forms. *See, e.g.*, *Metro. Life Ins. Co. v. Tremont Grp. Holdings, Inc.*, No. 7092, 2012 WL 6632681, at *9 (Del. Ch. Dec. 20, 2012) (holding that claims brought by partners and investors in a limited partnership were derivative where the injury was suffered by the limited partnership); *Matthew v. Laudamiel*, No. 5957, 2012 WL 605589, at *21 (Del. Ch. Feb. 21, 2012) (holding that claims

24

brought by LLC members were still derivative even after the dissolution of the LLC).

The Former Members and G-I are in contractual privity with one another but *not* with the Center via the Producer Agreement. It seems illogical to inquire whether one contract signatory's breach of contract claim against another signatory is derivative of a non-signatory's claim. While the Center was granted rights under the Producer Agreement, this does not make the Former Members' claims derivative. Once the Former Members were required to make additional payments to cover the shortfall in amounts due to asbestos plaintiffs caused by G-I's nonpayment, the Former Members suffered damages and had a straightforward breach of contract claim.

Even if we were to consider whether the Former Members' claims are derivative or direct under the *Tooley* rubric, it is clear that their claims are direct. As to the first question, the Former Members, not the Center, suffered the harm caused by G-I's breach. The Former Members, and any other Members who were required to pay additional amounts to cover for G-I's nonpayment, suffered a harm when they paid amounts beyond what was contractually required. The Center, on the other hand, suffered no harm once it required the other Members to cover for G-I's nonpayment and made the payments due to asbestos plaintiffs. As to the second question, the Former Members would receive the benefit of any recovery in the breach of contract action between two signatories to the contract. The Bankruptcy Court erred in concluding that the Former Members' claims are derivative of the Center's claim, and we conclude that this issue does not present a barrier to the Former Members' actions for breach of contract against G-I.

C.

25

The Bankruptcy Court further concluded that permitting the Former Members to recover on claims that the Center had already asserted and resolved under the Settlement Agreement would allow "an impermissible double recovery" against G-I. (A-70). The District Court declined to reach this issue. G-I asserts that it "understood the [Center's] Settlement Agreement to govern all [Center]-related claims, and the payment amount was the exclusive source of recovery for such claims." (G-I Br., at 39). But such a belief is in direct conflict with the explicit terms of both the Order and the Settlement Agreement. We reject G-I's argument and the Bankruptcy Court's conclusion for several reasons.

The Order approving the Settlement Agreement between the Center and G-I provided: "For the avoidance of doubt, nothing in this Order or the [Center's] Settlement Agreement shall release, prejudice, compromise or otherwise affect the claims, if any, that Former Members . . . have or may have against the G-I Plan Parties." (A-476). This language clearly reserves the Former Members' right to bring a breach of contract action and suggests that the Settlement Agreement did not cover the Former Members' claims.

Indeed, the terms of the Settlement Agreement itself show that the Former Members' claims were not a part of the Center's settlement recovery. The Settlement Agreement provides that the settlement payment that G-I pays to the Center represents "G-I's entire liability *to the [Center]* for its share of liability payments and allocated expenses under the terms of the Producer Agreement and Attachment A thereto." (A-428) (emphasis added). The Settlement Agreement states that upon the Center's receipt of the settlement payment, the Center and "the Members" release all claims and causes of action that they had or may have against G-I, including claims for any alleged breach of the Producer Agreement. (A-430).

The Settlement Agreement defines "Members" as "the present members of [the Center]," listing eight companies specifically. (A-423). The Former Members are not included in the eight companies listed as "Members" under the Settlement Agreement, nor were they "present members of [the Center]" on the date of the Settlement Agreement.

The Center had its own claim for damages based upon the settlement agreements worth $222 million that were voided due to G-I's breach. And the Former Members were not the only Members of the Center required to pay additional sums to cover G-I's share of asbestos settlements. To the extent that some of these companies are still Members of the Center, the Center could bring these claims against G-I on their behalf. Under the terms of the Settlement Agreement and the Order approving it, these were the claims that the Settlement Agreement resolved, not the Former Members' claims.

Further, the issue of "impermissible double recovery" goes to apportionment of liability, not to the Former Members' right to bring a cause of action under the Producer Agreement. G-I seems to recognize this point, by arguing that the Center's agreement to indemnify G-I against the Former Members' breach of contract claims, memorialized in the Settlement Agreement, has no bearing on the construction of the Producer Agreement. While we maintain that the Former Members' claims were not included in the Settlement Agreement, even if they were, this would not affect our reading of the Former Members' ability to bring a breach of contract action against G-I, because the terms of a settlement agreement to which the Former Members were not parties cannot change the construction of the Producer Agreement. In conclusion, we are not concerned, as the Bankruptcy Court was, that allowing the Former Members to assert breach of

contract claims against G-I would lead to an impermissible double recovery. The Center's recovery for its own claims and claims it brought on behalf of *present* Members of the Center have no bearing on the Former Members' claims, particularly when they were explicitly excluded from the Settlement Agreement between the Center and G-I.

IV.

For the foregoing reasons, we vacate the District Court's order affirming the Bankruptcy Court's grant of summary judgment in G-I's favor and remand to the District Court. The District Court should vacate its opinion and remand to the Bankruptcy Court for further proceedings consistent with this opinion. We have determined that the Producer Agreement does not prohibit the Former Members' breach of contract actions against G-I. The merits of the Former Members' claims – whether G-I breached the Producer Agreement, whether they can show damages, and whether G-I has any valid defenses – are not before this Court and we make no comment on their likelihood of success. On remand, the Bankruptcy Court may allow discovery and additional summary judgment motions on the merits of these claims or proceed to trial.