NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-1586
_____

In re DOWNEY FINANCIAL CORPORATION, Debtor

MATTHEW A. CANTOR, in his capacity as Chapter 7 Trustee for Downey Financial
Corp., and WILMINGTON TRUST COMPANY, in its capacity as Indenture Trustee

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, in its capacity as receiver for
Downey Savings and Loan Association, F.A.,
Appellant

On Appeal from the United States Bankruptcy Court for the District of Delaware
(Bankruptcy Nos. 08-13041 and 10-53731)
Bankruptcy Judge:  Honorable Christopher S. Sontchi

Submitted under Third Circuit LAR 34.1(a)
on January 22, 2015

Before:  FISHER; JORDAN; and GREENAWAY, JR., *Circuit Judges.*

(Opinion filed: January 26, 2015)

_____

OPINION*

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

GREENAWAY, JR.; *Circuit Judge*.

## I.    BACKGROUND

Downey Financial Corporation ("DFC") and its subsidiaries (including Downey Savings and Loan, F.A. (hereinafter "Downey Bank") (collectively the "Affiliated Group")) entered into a Tax Sharing Agreement ("TSA"), which provided for the filing of consolidated tax returns.  For companies engaged in this practice, IRS regulations state that any refund is to be paid to the parent company (here, DFC).  26 C.F.R. § 1.1502-77(a)(B)(2)(v).  The sole issue on appeal is the capacity in which DFC held the tax refunds.  This determination impacts whether the money is to be deemed part of DFC's bankruptcy estate or whether Downey Bank may receive the refunds outside of the bankruptcy process.

The Federal Deposit Insurance Corporation ("FDIC"), in its capacity as receiver for Downey Bank, appeals the Bankruptcy Court's grant of summary judgment in favor of DFC.  The Bankruptcy Court concluded that the TSA unambiguously established a debtor/creditor relationship between DFC and its subsidiaries and thereby declared over $370 million in tax refunds to be part of DFC's bankruptcy estate.  We will affirm.

## II.    ANALYSIS

We review the grant of summary judgment and the legal interpretation of contractual language de novo.  *U.S. Gypsum Co. v. Quigley Co. (In re G-I Holdings,*

*Inc.*), 755 F.3d 195, 201 (3d Cir. 2014).[1] Summary judgment is properly granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

A. Interpreting the TSA

Under California law,[2] "even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence [that] reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible." *Dore v. Arnold Worldwide, Inc.*, 139 P.3d 56, 60 (Cal. 2006) (internal quotation marks omitted). "'The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.'" *Id.* (quoting *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 644 (Cal. 1968)).

The Bankruptcy Court conducted a "preliminary [review] of all credible extrinsic evidence"[3] and correctly determined that it should not be considered to "override the

---

[1]    The Bankruptcy Court had jurisdiction pursuant to 28 U.S.C. § 157; we have jurisdiction to hear a direct appeal of the final judgment from the Bankruptcy Court in this instance pursuant to 28 U.S.C. § 158(d)(2).

[2]    It is undisputed that California law governs the TSA. TSA, § 3.3.

[3]    In this preliminary assessment, the Bankruptcy Court reviewed the declarations of Donald Royer (former General Counsel of DFC and Downey Bank) and William Lesse Castleberry (an expert specializing in federal income taxation). It correctly determined that neither should be considered in interpreting the TSA. The Royer Declaration was impermissible because he was not a signatory to the TSA and provided no contemporaneous evidence to support his conclusory assertions. *Giuliano v. FDIC (In re Downey Fin. Corp.)*, 499 B.R. 439, 463-64 (Bankr. D. Del. 2013). The Castleberry

3

'intent' expressly stated in the TSA." *Giuliano v. FDIC (In re Downey Fin. Corp.)*, 499 B.R. 439, 462-63 (Bankr. D. Del. 2013). The Bankruptcy Court correctly determined that "the TSA[ is] an integrated contract" (*In re Downey Fin. Corp.*, 499 B.R. at 463), which expressly states that the intent of the parties was "to establish a method for allocating the consolidated tax liability of each member among the Affiliated Group." TSA, § 2.1(a).

## B. Principal/Agent Relationship

The Bankruptcy Court determined, and we agree, that the TSA cannot be read as creating a principal/agent relationship under California law because Downey Bank did not exercise control over DFC's activities under the agreement. *FDIC v. Siegel (In re IndyMac Bancorp, Inc.)*, 554 F. App'x 668, 670 (9th Cir. 2014).[4] The TSA did not create for any subsidiary, including Downey Bank, an ability to control DFC's activities with respect to tax filing and refund allocation. Additionally, DFC had sole power to decide whether to seek a refund rather than a credit against the Affiliated Group's future liability. TSA § 2.4(a)

Contrary to Appellant's argument, the so-called "*Bob Richards* default rule" (which would assume an agency relationship in the consolidated tax filing context) is not

---

Declaration was inadmissible because contract interpretation is a legal question for which the court does not require expert opinion. *Id.*

[4] Appellant argues that *IndyMac* is distinguishable because in that case the parties agreed that the TSA was unambiguous. While the bankruptcy court opinion in *IndyMac* stated that both parties argued that the TSA was unambiguous in multiple briefs, the parties in *IndyMac* put forth contrary readings of the TSA — even while calling it "unambiguous" — thereby necessitating the court to engage in the same analysis as is required here. *Siegel v. FDIC (In re IndyMac Bancorp Inc.)*, No. 2:08-bk-21752, 2012 Bankr. LEXIS 1462, at *23 (Bankr. C.D. Ca. March 29, 2012). ("Thus, after considering all the materials before it, the Court has concluded that the TSA is not ambiguous, either on its face . . . or following a preliminary reference to the pertinent extrinsic evidence.").

applicable here because the parties have agreed to a TSA. *In re IndyMac Bancorp, Inc.*, 554 F. App'x at 670; *Sharp v. FDIC (In re Vineyard Nat'l Bancorp)*, 508 B.R. 437, 443 (Bankr. C.D. Cal. 2014).

C.     Trust

The FDIC's argument that the tax refunds were merely held by DFC in trust for Downey Bank is also inconsistent with the express terms of the TSA. Under California law, "[t]he absence of language creating a trust relationship is explicitly an indication of a debtor-creditor relationship." *In re IndyMac Bancorp, Inc.*, 554 F. App'x at 670; *see also In re Vineyard Nat'l Bancorp*, 508 B.R. at 445 ("[T]he TSA did not create an express trust as it lacked the necessary language to create such a trust. . . . The TSA did not identify the Debtor as, and the Debtor did not assent to becoming, a trustee."). The word "trust" does not appear in the TSA, nor is any party designated as a "trustee" or "beneficiary." The TSA includes words such as "make payment," "reimburs[e]," "compensat[e]," and "refund." § 2.1(a), (e), (f), (h). Such terms are indicative of a debtor/creditor relationship. *See Imperial Capital Bancorp, Inc. v. FDIC (In re Imperial Capital Bancorp, Inc.)*, 492 B.R. 25, 30 (Bankr. S.D. Cal. 2013) (acknowledging that "[c]ourts across the country have repeatedly held that terms such as 'reimbursement' and 'payment' in a tax sharing agreement evidence a debtor-creditor relationship"); *In re IndyMac Bancorp, Inc.*, 2012 Bankr. LEXIS 1462, at *39.

In addition to the language of the TSA, we are persuaded by: 1) the lack of any requirement that DFC segregate, or otherwise hold in escrow, money paid to it by Downey Bank and the other subsidiaries and 2) DFC's ability, at its "sole discretion," to

control the application for a refund or disposition of funds once received.[5]  § 2.4(a).  The only potential constraint on DFC's discretion is the requirement that it "consider in good faith any treatment proposed by the Affiliated Group members," but this does not override the grant to DFC of control over the refund process.  *Id.*

Downey Bank makes a superficially appealing argument that the TSA created a trust because of its requirement that "[i]n no instance shall the allocation of tax liability to any member . . . be less favorable than the tax liability which would result from such member filing a separate tax return."  § 2.1(d).  However, "[a] debtor-creditor relationship may exist 'even though the payee may be contractually obligated to pay an equal amount to a third person.'"  *In re IndyMac Bancorp, Inc.*, 554 F. App'x at 670 (quoting *Petherbridge v. Prudential Sav. & Loan Ass'n*, 79 Cal. App. 3d 509, 518 (Cal. Ct. App. 1978)).

In light of these facts, the TSA does not create a trust under California law.  *See Altura P'ship v. Breninc, Inc. (In re B.I. Fin. Servs. Grp., Inc.)*, 854 F.2d 351, 354 (9th Cir. 1988) (concluding no trust existed where the words "trust," "trustee," or "beneficiary" were not used; the payee was not required to segregate funds; and the payee could use the money for its own purposes); *see also In re Vineyard Nat'l Bancorp*, 508

---

[5]    The TSA provided DFC the right, "in its *sole discretion*:  (i) to determine (A) the manner in which such returns shall be prepared and filed, including, without limitation, the manner in which any item of income, gain, loss, deduction or credit shall be reported . . . (C) the elections that will be made . . . on behalf of any member of the consolidated group . . . (ii) to consent, compromise or settle any adjustment or deficiency proposed . . . (iii) to file, prosecute, compromise or settle any claim for refund; and (iv) to determine whether any refunds to which the consolidated group may be entitled shall be paid by way of refund or credited against the tax liability of the consolidated group."  § 2.4(a) (emphasis added).

B.R. at 442 (concluding that because "the [parent] would have owed the [subsidiary] sums it did not receive from the IRS if the [subsidiary] were entitled to receive a refund [had it filed] a separate return," the TSA created a "debtor-creditor relationship because it established the [parent's] obligation irrespective of whether a refund was obtained").

### D. Resulting Trust

The FDIC's final argument is that we should find the existence of a resulting trust. This is an equitable remedy "'aris[ing] by operation of law from a transfer of property under circumstances showing that the transferee was not intended to take the beneficial interest.'" *Fid. Nat'l Title Ins. Co. v. Schroeder*, 101 Cal. Rptr. 3d 854, 864 (Cal. Ct. App. 2009) (quoting *Lloyds Bank Cal. v. Wells Fargo Bank*, 232 Cal. Rptr. 339, 341 (Cal. Ct. App. 1986)). In other words, a resulting trust works to prevent unjust enrichment. The TSA's grant to DFC of sole discretion to make decisions about the tax filings indicates that "the parties *intended* that DFC obtain beneficial interest in the refunds it received." *In re Downey Fin. Corp.*, 499 B.R. at 471. Because "[t]here is nothing 'unjust' about enforcing the parties' contractual obligations set forth in the TSA," an equitable remedy is inappropriate. *Id.* at 470.

### III. CONCLUSION

In light of the foregoing analysis, we conclude that the TSA unambiguously created a debtor/creditor relationship between DFC and its subsidiaries. As such, the tax refunds are part of DFC's Chapter 7 bankruptcy estate. We will affirm the Bankruptcy Court's judgment.